#25116-rev & rem-SLZ

**2010 SD 63**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                          Plaintiff and Appellee,

    v.

KENNETH C. HUBER,                               Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT
OF THE SIXTH JUDICIAL CIRCUIT
HYDE COUNTY, SOUTH DAKOTA

* * * *

HONORABLE JAMES W. ANDERSON
Judge

* * * *

MARTY J. JACKLEY
Attorney General

STEVEN R. BLAIR
Assistant Attorney General                      Attorneys for plaintiff
Pierre, South Dakota                            and appellee.

MICHAEL J. BUTLER
Sioux Falls, South Dakota

CLINT L. SARGENT of
Meierhenry & Sargent, LLP                       Attorneys for defendant
Sioux Falls, South Dakota                       and appellant.

* * * *

ARGUED ON MAY 25, 2010

OPINION FILED **07/28/10**

#25116

ZINTER, Justice

[¶1.]        A jury found Kenneth C. Huber (Huber) guilty of first degree murder in connection with the shooting death of his wife, Pam Huber.  The only dispute was whether the shooting was accidental or intentional.  The State's theory was that Huber, a former chief of police, was an expert marksman who was too well-trained in the safe-handling of handguns for the shooting to have been an accident.  Over Huber's *Daubert* objection, the circuit court admitted the State's expert's testimony that the shooting was inconsistent with an accidental act because well-trained officers do not accidentally discharge their firearms.  On the other hand, the court refused Huber's expert's testimony that well-trained officers do accidentally discharge their firearms when certain conditions occur.  Huber appeals these rulings.  He also appeals: the circuit court's refusal to admit rebuttal evidence of a deputy sheriff who accidentally discharged a handgun; the court's admission of Pam's out-of-court statements; and, the court's admission of other acts evidence.  We reverse and remand for new trial on the circuit court's refusal to allow Huber's expert to testify.  We affirm the circuit court on all other issues.

*Facts and Procedural History*

[¶2.]        We restate the facts in a light most favorable to the jury's verdict. Huber and Pam married in 1993.  They had two daughters who were residing in the home: Kari (thirteen years old) and Stephanie (eleven years old).  Pam was the City Finance Officer for Highmore, South Dakota.  Shortly before the incident, Huber had been Highmore's Chief of Police.

-1-

[¶3.]     At the time of the shooting, Huber and Jennifer Lowrie, the Hyde County State's Attorney, were involved in an extramarital affair that began in July 2007. Huber also had a previous extramarital affair with Cindy Erwin. Huber's affair with Erwin started in the spring of 2005, and Erwin ended the affair in September 2005. According to Lowrie, Huber said he still loved Erwin, and Huber was obsessed over the way the relationship with Erwin had ended. Lowrie testified that in mid-October 2007, Huber was still discussing Erwin with both Pam and Lowrie.

[¶4.]     Huber resigned as Highmore's Chief of Police in August 2007 to take a job with the Miller Police Department. While working in Miller, Huber met Tiffany Joy. Joy had asked the Miller police department to help with harassment she was receiving from her ex-husband. Joy testified that Huber would stop by her residence to check on Joy and her children. Toward the end of August 2007, Huber purchased a new car and took Joy and two of her children for a ride. At some point after this incident, Huber attempted to kiss Joy, but Joy rebuffed his attempt. When Joy's ex-husband learned about the car ride, he filed a grievance with the city commission and petitioned for a protection order against Huber. The city commission asked Huber to resign. Huber submitted his resignation on September 28, 2007.

[¶5.]     Huber's resignation left him unemployed and under considerable stress. Huber unsuccessfully attempted to find a new law enforcement position. In September 2007, Pam e-mailed Lowrie telling her that Huber was drinking himself

to sleep every night. Huber was also taking sleeping pills. Lowrie testified that in mid-October, she witnessed a fight between Huber and Pam over financial matters.

[¶6.] On Sunday evening, October 28, 2007, at approximately 10:00 p.m., Huber made a fifty-minute phone call to Lowrie. Sometime after the phone call, Stephanie entered her parents' bedroom and joined Huber on the bed to watch television. Pam subsequently joined Stephanie and Huber on the bed, where the three watched television together.

[¶7.] Stephanie testified that shortly thereafter, Huber walked to a dresser on Pam's side of the bed and retrieved his duty firearm, a .40 caliber Glock Model 22 handgun. The handgun was loaded with Smith and Wesson Black Talon ammunition. A tactical light (a laser/flashlight device) was attached to the rail of the gun. Stephanie testified that the previous night, Huber had taken the Glock out of his duty-belt and checked the tactical light before replacing the gun in the belt.

[¶8.] Stephanie observed Huber walk around the foot of the bed. Huber carried the Glock in his right hand with his finger off the trigger. He then placed the gun on the corner of the bed while he used a stool to search the shelves in the bedroom closet. He stepped down from the stool, picked up the gun, and walked into the hallway. Huber had a gun safe in the hallway immediately adjacent to the bedroom door. A person could stand facing the gun safe and, by looking to the right, see into the bedroom.

[¶9.] Stephanie heard clicks and beeps coming from the hallway, which indicated an attempt to open the gun safe.[1] Stephanie testified that she then drifted off to sleep. About three to five minutes later, around 11:30 p.m., Stephanie awoke to the sound of a gun shot. She immediately observed that Pam had been shot in the forehead.

[¶10.] Huber came rushing into the room. Stephanie testified, "I seen my dad running over to my mom and saying, 'it's an accident.'" Huber told Stephanie to get Kari, to call 911, and to call Lowrie. When Kari arrived in the bedroom, Huber (who was a certified emergency medical technician) told Kari and Stephanie to retrieve his EMT bag. Huber began administering first aid.

[¶11.] Huber also called 911, but the call was disconnected. Kari then called Lowrie and told her to come to the house. After the Lowrie call, the 911 operator called and spoke with Stephanie. While Stephanie was speaking with the 911 operator, Lowrie arrived at the Huber home. Lowrie took the phone from Stephanie and spoke with the 911 operator until an ambulance arrived.

[¶12.] The 911 call was recorded, and Huber can be heard in the background speaking with the 911 operator, stating that the shooting was an accident.

> Huber: My wife has been shot. I'm here, it was me, it was an accident. (Huber in the background talking to his girls) Hang

---

1. DCI Special Agent Jason Baldwin testified that access to the Huber gun safe would be gained by entering a numerical code on a keypad and then turning the safe's handles. Each time a person pressed a number on the keypad, an audible "beep" would sound. Once a person entered the correct combination, several beeps would sound. As the safe's handles turned, a loud metallic "thunk" would be heard. Stephanie testified that she did not hear the "thunk."

on dial, Jennifer. . . . She was shot in the head – she was shot in the head, it ain't good.
911: Where is she shot?
Huber in background: Right above the left eye. . . Right above the right eye.
911: What was she shot with?
Huber in background: Glock 40 with black talon.
911: Was he cleaning his gun?
Stephanie: Were you cleaning?
Huber in background: Moving it from the safe over to here.

[¶13.] Emergency responders were dispatched by the 911 operator. An emergency medical technician testified that Huber said the shooting had occurred accidentally while he was moving his gun. The ambulance transported Pam and Huber to a medical facility in Miller.

[¶14.] Law enforcement subsequently took Huber from Miller to the Hyde County Courthouse in Highmore. Highway Patrolman Randi Erickson administered a breath test, which indicated there was no alcohol in Huber's system.[2] Huber, who knew Erickson through his work in law enforcement, said: "I'm sorry, Randi. It was an accident."

[¶15.] Pam died on November 2, 2007. Huber was arrested four days later. Prior to trial, both parties made motions relating to the admission of evidence. The circuit court allowed the State's proposed use of Pam's out-of-court statements and Huber's other acts. Both types of evidence related to domestic abuse and the tenuous nature of the marital relationship. The circuit court also allowed the State's expert to give an opinion that the shooting was inconsistent with an

---

2. Oxycodone, hydrocodone, gabapentin (prescription pain medications), zolpidem (a sleeping aid), alprazolam (an anti-anxiety medication), and cold and allergy medications were in his system.

accidental act of a well-trained police officer. The court finally ruled that Huber's expert could neither opine that law enforcement officers accidentally discharge their firearms nor give examples of possible causes of accidental discharges.

[¶16.] Huber raises the following issues on appeal:

1. Whether the circuit court abused its discretion in allowing the State's expert to testify that the events were inconsistent with an accidental act of a well-trained police officer.

2. Whether the circuit court abused its discretion in excluding Huber's expert's testimony that (1) law enforcement officers accidentally discharge their firearms, and (2) there are possible causes of accidental discharges.

3. Whether the circuit court abused its discretion in excluding Huber's rebuttal evidence of another law enforcement officer who accidentally discharged a Glock handgun.

4. Whether the circuit court abused its discretion in admitting Pam's out-of-court statements and Huber's other acts evidence.

*1. The State's Expert Testimony*

[¶17.] At a *Daubert* hearing, Huber unsuccessfully objected to the testimony of the State's firearms training expert, John Farnam. Thus, Farnam was permitted to testify: that people like Huber, who are certified firearms instructors and "Glock Armorers" (persons who have completed Glock Armorers training), are instructed to keep their fingers off the trigger and outside the trigger guard until they intend to fire; that keeping one's finger in this "register" position prevents the vast majority of accidents; and, that Farnam's well-trained students never accidentally discharged their firearms when their fingers were in the register position. Farnam opined that if the trigger finger is in the register position, it is not possible in a "practical sense"

for a gun to discharge accidentally. He testified: "It may be possible in an astronomical sense. But among trained people whose finger is where it belongs, it's rare enough where I can say it's not going to happen in a practical sense." Farnam ultimately opined that the facts of this case were inconsistent with an accidental shooting.

[¶18.] Huber did not challenge Farnam's qualifications as an expert or the relevance of Farnam's testimony. Rather, Huber objected to the reliability of Farnam's testimony. Huber reasserts that objection on appeal, arguing that the circuit court failed to (1) analyze the foundation upon which Farnam's opinion was based, (2) evaluate the methodology used by Farnam to arrive at his opinion, and (3) make any findings regarding the reliability of Farnam's conclusion. "We review a circuit court's decision to admit or deny an expert's testimony under the abuse of discretion standard." *Burley v. Kytec Innovative Sports Equip., Inc.*, 2007 SD 82, ¶ 12, 737 NW2d 397, 402.

[¶19.] The admission of expert testimony is governed by SDCL 19-15-2 (Rule 702), which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

South Dakota courts determine the admissibility of expert evidence in accordance with *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 US 579, 113 SCt 2786, 125 LEd2d 469 (1993). *State v. Weaver*, 2002 SD 76, ¶ 25, 648 NW2d 355, 364-65. The *Daubert* standard requires that the circuit court ensure an expert's testimony "rests

on a reliable foundation[.]" *State v. Hofer*, 512 NW2d 482, 484 (SD 1994)) (quoting *Daubert*, 509 US at 597, 113 SCt at 2799). "The burden of demonstrating that the testimony is . . . reliable rests with the proponent of the testimony. . . . The proponent . . . must prove . . . admissibility by a preponderance of the evidence." *State v. Lemler*, 2009 SD 86, ¶ 23, 774 NW2d 272, 280 (citation omitted). A circuit court has "'considerable leeway' in deciding in each case 'how to go about determining whether particular expert testimony is reliable.'" *Burley*, 2007 SD 82, ¶ 25, 737 NW2d at 406 (citation omitted).

*Foundation*

[¶20.]        Huber argues that Farnam's testimony was not reliable because the foundation was inadequate for his ultimate conclusion that the shooting was inconsistent with an accidental act. Relying on *State v. Guthrie*, 2001 SD 61, 627 NW2d 401, Huber contends that because Farnam testified that the events were inconsistent with an *accidental act*, Farnam was required to compare the facts of this case with the known characteristics of *accidental shootings*. Huber asserts that Farnam's opinion was foundationally deficient because it was based on Farnam's specialized knowledge of the safe gun-handling characteristics of well-trained police officers rather than the characteristics of accidental shootings.

[¶21.]        *Guthrie* involved specialized knowledge of syndromes and psychological autopsies in cases involving suicide. *Id.* ¶¶ 40-42, 627 NW2d at 418-19. We stated, "[i]n allowing experts with specialized knowledge to testify, courts applying *Daubert* generally permit these experts to describe the symptoms or behaviors of known victims, report the symptoms or behaviors observed in the

victim in the present case, and give an opinion that the victim's symptoms or behaviors are 'consistent with' those of known victims." *Id.* ¶ 42, 627 NW2d at 419. Although *Guthrie* involved an opinion based on the known characteristics of suicide victims, *Guthrie* did not adopt a "known characteristics of similar victims" test as the sole foundation for all comparative opinions. On the contrary, *Guthrie* left the foundational basis for expert opinion open, stating:

> The factual basis for an expert opinion is given wide latitude. Under SDCL 19-15-3 [(Rule 703)], experts may base their opinions on facts perceived by or made known to them at or before the hearing, if of a type reasonably relied on by experts in the field in forming opinions, and the facts or data need not be admissible in evidence.

*Id.* ¶ 34, n8, 627 NW2d at 416.

[¶22.]     Therefore, *Guthrie* should not be read to suggest that an accidental discharge opinion may be based only on a comparison of the known characteristics of accidental shootings. Such opinions may be based on any type of facts reasonably relied on by experts in the field. *Id.* Logically, a comparison of the known characteristics of individuals who are specially trained in the safe-handling of firearms is probative in determining whether such an individual accidentally discharged a firearm. This probative foundation is apparent, and we reject Huber's restrictive interpretation of *Guthrie*.

[¶23.]     Huber also argues foundational deficiency because Farnam offered no study or empirical data supporting his "inconsistent with" a well-trained officer opinion. However, studies or empirical research are not required in every case. "*Daubert* and its progeny only 'offer general guides for courts to consider in assessing reliability[.]'" *In re* T.A., 2003 SD 56, ¶ 27, 663 NW2d 225, 234 (quoting

Garland v. Rossknecht, 2001 SD 42, ¶ 11, 624 NW2d 700, 703). These factors cannot be applied in all settings. "[T]he measure of intellectual rigor will vary by the field of expertise and the way of demonstrating expertise will also vary." *Burley*, 2007 SD 82, ¶ 25, 737 NW2d at 406. In some instances, reliability must focus simply on "'knowledge and experience.'" *In re* T.A., 2003 SD 56, ¶ 27, 663 NW2d at 234 (quoting *Garland*, 2001 SD 42, ¶ 11, 624 NW2d at 703). Thus, as we observed in *Guthrie*, even though an expert does not rely on empirical studies, an expert with special expertise based on observation and experience may testify on the "behaviors" of known individuals. 2001 SD 61, ¶ 42, 627 NW2d at 419.

[¶24.] In this case, Farnam's testimony was based on specialized expertise gained in over thirty years of observation and experience with the behavior of individuals who had received training in the safe-handling of firearms. Farnam's experience included military service, law enforcement service, and consulting services provided as the president of a company providing firearms safety training. He was also current on literature in the field, he was the author of four books on firearms, he had completed the Glock Armorer's safety course, he was a certified law enforcement officer firearms instructor, he held membership in relevant associations, and he had testified in one prior law enforcement officer's firearm discharge case. Farnam had also read the police reports, grand jury testimony, witness statements, autopsy and forensic reports; and he had examined the scene and Glock handgun. Farnam's opinion was based on his specialized knowledge of the behavior of individuals who had received extensive training in the safe handling

of firearms. The circuit court did not abuse its discretion in finding there was a reliable foundation for Farnam's testimony.

*Methodology*

[¶25.] Huber next challenges the circuit court's assessment of Farnam's methodology. A circuit court may consider the following nonexclusive guidelines for assessing an expert's methodology:

> (1) whether the method is testable or falsifiable; (2) whether the method was subjected to peer review; (3) the known or potential error rate; (4) whether standards exist to control procedures for the method; (5) whether the method is generally accepted; (6) the relationship of the technique to methods that have been established as reliable; (7) the qualifications of the expert; and (8) the non-judicial uses to which the method has been put.

*Guthrie*, 2001 SD 61, ¶ 35, 627 NW2d at 416. Huber argues that had the circuit court applied these factors to Farnam's comparative methodology, the court would have come to the conclusion that Farnam was only offering subjective argument. *See id.* ¶ 36, 627 NW2d at 416-17 (noting that to be reliable, an expert's opinion must be "derived from the foundations of science rather than subjective belief").

[¶26.] As previously noted, however, Farnam's opinion was based on a comparative analysis of the facts of this case with his specialized knowledge of the behavior of well-trained law enforcement officers. Therefore, Farnam's analysis was not mere subjective opinion. Although the circuit court did not analyze the eight nonexclusive factors, most of those factors are applied to evaluate scientific theories rather than a comparative analysis of human behavior. Additionally, this Court has never required a circuit court to address the eight factors in every case, and we do not do so now.

[¶27.]    Huber next argues that Farnam's methodology allowed him to make "the inferences the jury was supposed to make for themselves" and Farnam's "opinion merely told the jury what to do." We disagree. In *Guthrie,* we disapproved of an unequivocal expert opinion on the ultimate issue that the victim "did not die by suicide." *Id.* ¶ 33, 627 NW2d at 415. In this case, Farnam did not testify that Pam died as a result of an intentional shooting, and he did not opine on Huber's guilt or innocence. *See* State v. Moran, 2003 SD 14, ¶ 43, 657 NW2d 319, 329 ("An expert can testify as to the ultimate issue 'as long as the witness is not asked whether the defendant is innocent or guilty.'" (citation omitted)). Farnam's opinion was limited to whether the facts of this case were inconsistent with the act of a well-trained officer. This opinion did not invade the province of the jury.

[¶28.]    Huber finally challenges Farnam's methodology, noting that Farnam did not sit through the trial and listen to witnesses testify. Huber points out that Farnam was unaware of Stephanie Huber's trial testimony regarding Huber's activities immediately before the shooting. Huber also notes that Farnam admitted he did not know in which hand or how Huber held the gun prior to the shooting. Experts are not, however, limited to rendering opinions based on trial testimony. They are entitled to rely on out-of-court evidence in forming their opinions. SDCL 19-15-3 (Rule 703). Further, Huber cross-examined Farnam regarding his knowledge of the trial testimony. These alleged deficiencies went to the weight rather than the admissibility of Farnam's testimony. *See Burley*, 2007 SD 82, ¶ 24, 737 NW2d at 406 (stating any deficiencies in an expert's opinion or qualifications

can be tested through the adversary process at trial). We see no error in the court's assessment of Farnam's methodology.

*Findings Regarding the Reliability of Expert Conclusions*

[¶29.] Huber contends that the circuit court erred in failing to make findings regarding the reliability of Farnam's conclusions. As we recently observed, however, "[i]n applying *Daubert,* '[t]he focus . . . must be solely on principles and methodology, *not on the conclusions* that they generate.'" *Lemler,* 2009 SD 86, ¶ 25, 774 NW2d at 281 (citation omitted) (emphasis added). Therefore, the circuit court was not required to enter findings on the reliability of Farnam's ultimate conclusions. For all of the foregoing reasons, the circuit court did not abuse its discretion in admitting Farnam's testimony.

2. *Huber's Expert Testimony*

[¶30.] Huber's expert, Dr. Roger Enoka, was prepared to testify that well-trained law enforcement officers unintentionally discharge their firearms. Dr. Enoka's expertise was in the areas of kinesiology, biomechanics, neurophysiology, and neuromechanics. He described this expertise as "explaining human movement," including how the muscles contract and work within the body.

[¶31.] In Huber's written offer of proof and during the *Daubert* hearing, Dr. Enoka proposed to testify that factually, accidental discharges can be caused by: (1) sympathetic muscle contractions, (2) loss of balance, (3) the "startle effect," and (4) "reactive grip response."[3] Huber's written offer of proof and Dr. Enoka's proposed

---

3. Dr. Enoka described reactive grip response as an involuntary muscle action occurring when something a person is holding begins to slip out of that

(continued . . .)

-13-

testimony was not, however, limited to these four factual possibilities. Dr. Enoka

was also prepared to testify that, contrary to the State's well-trained officer theory:

- One study has shown that as many as 20% of well-trained law enforcement officers will allow their finger to make contact with the handgun's trigger without the officer's knowledge;
- Well-trained law enforcement officers unintentionally discharge their weapons; and
- Teaching law enforcement officers to keep their index finger away from the trigger is not, itself, enough to prevent incidents of unintentional discharge.

Regarding this generalized proffer, Dr. Enoka testified:

> Q: Based on your experience and the research that you've done, do you believe that [the] procedure of holding the finger outside the trigger guard until a decision to fire has been made, do you believe that procedure prevents all unintentional discharges of firearms?
> A: I do not.
> . . . .
> Q: Do you have an opinion as to whether well-trained law enforcement officers ever unintentionally discharge their weapons?
> A: Yes, I believe that they can.
> Q: And what do you base that opinion on?
> A: I base that on the number of cases that I've been involved in, in talking with law enforcement officers who've experienced this, the remorse that they express.

Following his proffer, Huber argued that Dr. Enoka's testimony was relevant to his

defense, relevant to rebut the State's trial theory,[4] and relevant to rebut Farnam's

_____

(. . . continued)

person's hand, causing the person to strengthen his or her grip. Dr. Enoka indicated that bumping one's arm while carrying a cup of coffee is a common example.

4.   The State's theory is summarized in its final argument. The State argued that Huber:

(continued . . .)

testimony. Counsel argued:

> It's pretty obvious where [the State's theory] is going. You know, [the State is suggesting Huber is] the most well-trained officer in South Dakota, we're learning, the safest officer in South Dakota. The implication is if you're both, if you're a Glock Armorer, you do not have accidents. And it's simply false and it's misleading to the jury and they're taking full advantage of it by bringing in these people to say, as this guy [Farnam] is going to testify, in my opinion, it's highly unlikely it was an accident because he's too well-trained. . . . This is simply fair rebuttal to this general proposition that they're asserting he is guilty because he's too well-trained to have had an accident. And we have a right here to defend.

[¶32.]    The circuit court found that Dr. Enoka was qualified and that his testimony was reliable (calling it "good science"). However, the court found that Dr. Enoka's four factual possibilities were not relevant until there was evidence that one of those possibilities occurred. Focusing on Dr. Enoka's testimony regarding four possible causes of accidental discharges, the court explained:

> The testimony that's been presented is that these reactions occur in various different situations; a startling event, loss of balance, sympathetic response or reactive grip response. There's no evidence in the testimony in the record that any of those things happened. About the best that could be said about

_____

(. . . continued)

> [H]ad an easy, clear shot at Pam's head. Easy when you got a laser and also easy when you've got the training and experience and are as good a shot as Ken Huber is. . . . [H]e could accomplish it even being out of [Pam's] line of sight. . . . [T]his wasn't some happenstance shot that was some kind of accident. Ken Huber knew exactly where this bullet was going to go. . . . Ken's an ex-marine where he was honored with the sharpshooter badge. . . . He was a Glock Armorer in 1993 and 2006. And he took and successfully passed a forty-five hour police firearms instructor school in 2006. . . . The evidence is he was an excellent marksman and the evidence is he was an excellent safe gun handler.

> Dr. Enoka's testimony is that sometimes things happen in kind of similar circumstances. And that's not good enough to make it expert testimony to present to the jury.

The court indicated if Huber presented evidence that one of these four causes may have occurred, Dr. Enoka's testimony would then become relevant and admissible. On appeal, Huber argues that all of Dr. Enoka's testimony was not only relevant to Huber's defense, but also relevant to rebut the State's evidence that well-trained officers do not accidentally discharge firearms.

[¶33.]     Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." SDCL 19-12-1 (Rule 401). SDCL 19-15-2 (Rule 702) provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact *in issue*," then an expert may testify on that issue. (Emphasis added.) The Supreme Court has explained that under Rule 702, this fact-in-issue aspect of relevancy "is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 US at 591, 113 SCt at 2796. In other words, the factual relevancy question is dependent on whether there is a sufficient "fit" between the specific facts of the case and proffered expert testimony. *Id.*

[¶34.]     In making its relevancy determination, the circuit court focused on the factual fit for Dr. Enoka's four possible causes of accidental discharges. The court concluded there was no fit because there was no evidence suggesting that one of those four possibilities occurred. We conclude that based on Huber's proffer as a

whole, the court misapplied this relevancy rule in two respects. First, it focused exclusively on Dr. Enoka's four possible causes to the exclusion of Dr. Enoka's three generalized opinions. Second, the court did not give consideration to the factual relevancy of all Dr. Enoka's testimony to rebut the State's experts' theory of the case.

[¶35.]     The record reflects that a number of times immediately after the incident Huber indicated that the shooting was an accident. Those statements, together with the State's well-trained officer evidence, made Dr. Enoka's generalized, non-fact specific testimony relevant. As previously noted, Dr. Enoka's proffer included non-fact-specific opinions that one study has shown as many as 20% of well-trained law enforcement officers allow their finger to make contact with the handgun's trigger without the officer's knowledge; that well-trained law enforcement officers do unintentionally discharge their firearms; and that teaching law enforcement officers to keep their index finger away from the trigger does not always prevent unintentional discharges. These non-fact specific opinions were relevant to the accidental/intentional discharge issue. Moreover, Dr. Enoka's four fact-specific possible causes explained his opinion and rebutted Farnam's opinion.[5]

---

5.     It is also significant that Dr. Enoka would have responded to other State witnesses used to establish its theory that the shooting was inconsistent with an accidental discharge. The State called Seth Bradbury, a firearms expert, who testified that Huber's gun had a five-pound trigger pull. Bradbury characterized the trigger force necessary to discharge such a gun as: "A five pound bag of sugar hanging on your finger. If you hung a five pound bag of sugar off your finger, that's how hard you got to pull this thing in order to make it go off." Dr. Enoka would have rebutted this analogy, explaining how five pounds of pressure is measured and opining that Bradbury's analogy was misleading. Dr. Enoka would have also rebutted the inferences flowing from

(continued . . .)

Therefore, there was a factual fit making Dr. Enoka's testimony relevant. The circuit court misapplied the relevancy rule in not considering admission of Dr. Enoka's opinions for these purposes. As we stated in *State v. Packed,* 2007 SD 75, ¶ 25, 736 NW2d 851, 859: "When a defendant's theory 'is supported by law and . . . has some foundation in the evidence, *however tenuous*[,]' the defendant has a right to present it." (Emphasis added) (citation omitted).

[¶36.] The State contends that any error in refusing to admit Dr. Enoka's testimony was harmless and not prejudicial. The State notes that Huber was able to place rebuttal testimony before the jury through the cross-examination of Farnam. We believe that the exclusion of Dr. Enoka's testimony was prejudicial notwithstanding Huber's ability to cross-examine Farnam.

[¶37.] The criminally accused's right to proffer a defense is fundamental. As this Court noted in *State v. Lamont*, a defendant must be allowed to present his theory and respond to the State's case:

> When a defendant is denied the ability to respond to the State's case against him, he is deprived of "his fundamental constitutional right to a fair opportunity to present a defense." We cited in *State v. Iron Necklace*, 430 NW2d 66, 75 (SD 1988), notions of fundamental fairness require "that criminal defendants be afforded a meaningful opportunity to present a complete defense." It is only fair that a defendant in a criminal trial be allowed to present his theory of the case.

---

(. . . continued)

> the testimony of Taunya O'Connor, Art Aplan, Doug DeBoer and Terry Deuter. These witnesses testified about Huber's firearms training and shooting skill. Dr. Enoka would have responded that in his twenty years studying unintentional discharges and consulting in civil lawsuits, he observed several examples of well-trained police officers, following all recommended safety rules, still unintentionally discharge their firearms.

2001 SD 92, ¶ 16, 631 NW2d 603, 608-09 (citations omitted). Dr. Enoka would have supported Huber's accident theory and rebutted the State's evidence regarding its well-trained officer theory. Without Dr. Enoka, Huber had no witness to rebut the State's numerous witnesses and present a "complete defense." *See id.* We believe that in all probability the jury's verdict was affected by Huber's inability to have any expert witness support his theory and rebut the State's witnesses. *See* State v. Michalek, 407 NW2d 815, 818 (SD 1987) ("'Prejudicial error' is error which in all probability must have produced some [a]ffect upon the jury's verdict and is harmful to the substantial rights of the party assigning it."). *See also Packed,* 2007 SD 75, ¶ 27, 736 NW2d at 860 ("Those denied the ability to respond to the prosecution's case against them are effectively deprived of a 'fundamental constitutional right to a fair opportunity to present a defense.'" (citation omitted)). We conclude that the circuit court misapplied the factual relevancy requirement of SDCL 19-15-2 (Rule 702). The court's exclusion of Dr. Enoka's evidence was prejudicial error requiring a new trial.

### 3. Exclusion of Evidence of Another Accidental Discharge

[¶38.] The State moved to preclude evidence of instances in which other law enforcement officers accidentally discharged their firearms. The State argued that such evidence was not relevant to the issues and more prejudicial than probative. Huber argued that the evidence was relevant to rebut Farnam's testimony and the State's well-trained officer theory. The circuit court disallowed the evidence under SDCL 19-12-3 (Rule 403). The court found that the evidence was only peripherally

relevant, and that the risk of confusion, delay, and misleading the jury substantially outweighed its probative value.

[¶39.]    On appeal, Huber challenges the circuit court's decision regarding one instance involving an accidental discharge of an identical handgun. The accidental discharge occurred in October 2006, on the boundary of Rapid City in Meade County (hereinafter "the Meade County incident"). Deputy Wood, a Pennington County deputy sheriff, was walking down a hallway of a home when he came upon a closed door. Wood, who was left-handed, carried his handgun in his left hand. He attempted to open the door by pushing it with a "ballistic shield" that he carried in his right hand. When the attempt failed, he turned on the tactical light mounted on the handgun, and at the same time he kicked the closed door. Deputy Wood stated that his finger was in the register position off the trigger at the time he turned on the tactical light. After kicking the door, Deputy Wood pushed against the door with his shield. Wood claimed to have felt resistance that resulted in his grip tightening, and he unintentionally discharged the handgun.

[¶40.]    Huber argues that the circuit court abused its discretion in disallowing evidence of this incident because the court failed to consider the rebuttal value of the evidence. Although this is an extremely close question, we cannot say that the circuit court abused its discretion in excluding this evidence under SDCL 19-12-3 (Rule 403).

[¶41.]    The Meade County incident was not directly relevant to whether Huber accidentally or intentionally shot Pam. Rather, the evidence was only inferentially relevant in that on one occasion, under different circumstances, a law

enforcement officer using an identical handgun accidentally discharged the firearm. Although the State's theory made this evidence circumstantially relevant, the circuit court was concerned that the evidence would have caused the parties, during the course of Huber's trial, to engage in side litigation over the details of the Meade County incident to determine its similarity and resulting degree of relevance. Moreover, the State points out that this would have led to the prospect of admitting other cases of accidental discharges requiring mini-trials on each incident. The circuit court's balancing of circumstantial relevancy against the undue delay and confusion does not reflect an abuse of discretion.

[¶42.] Huber also argues that the circuit court prohibited Huber from cross-examining Farnam on examples of other accidental discharges by other well-trained individuals. Our review of the record does not support this argument. Huber asked Farnam on cross-examination:

> Q: You stay up on the literature, you stay up on the periodicals. How many times have you read or learned or known about well-trained law enforcement officers unintentionally discharging their Glocks?
>
> A: [S]tories are made up or stories are embellished to somehow fault the gun . . . stories circulate around. We have to be very cautious about the facts surrounding them. But sure, there are lots of incidents I've heard about.
>
> Q: You've heard about lots of incidents?
>
> A: Yes.

This does not reflect a complete denial of cross-examination. We affirm the circuit court's exclusion of the Meade County incident.[6]

### 4. Admission of Statements of the Decedent and Admission of Other Acts

[¶43.] The State moved to admit approximately fifty out-of-court statements Pam made to numerous witnesses. The statements included e-mails and other written communications spanning most of the marriage. They disclosed the nature of the relationship between Huber and Pam, Huber's abuse and infidelity in the marriage, Pam's fear of Huber, and both parties' intentions with regard to divorce, separation and maintenance of their family.[7] The State argued that the statements were admissible as state of mind declarations or as residual hearsay.

---

6. The circuit court is free to reconsider its decision on remand in light of our discussion in Issue 2.

7. The list of evidence in the State's motion is substantial: twenty pages, single-spaced. The majority of the statements are e-mails between Pam and Cindy Erwin or Pam's sisters. Some of the statements include the following:

When Huber was the Chief of Police in Miller, Pam told her sister Nadine Stephenson that Pam was afraid of Huber. Pam asked Stephenson that if something ever happened to Pam, would Stephenson take care of her daughters. Pam also told Stephenson that Pam needed a "code" to call Stephenson. Pam said she would call Stephenson and say, "It's Pam," if Huber was hitting her. That way, Stephenson would know that Pam needed help.

Pam e-mailed her sister Nancy Roth in June 2001, and indicated that she was afraid of Huber and that Huber hits her. In August 2005, Pam e-mailed Roth that:

> It hasn't always been bad. It's just that the bad parts have been really bad. It's like he's two different people. . . . It's the living together that has been our downfall.

(continued . . .)

#25116

_____
(. . . continued)

Pam e-mailed Roth in January 2007 indicating that: "Things here are strained, they probably always will be. Sometimes I wonder if it's worth it. Other times we get along fine. We're having money crunch again but are trying to work together on it. I hate giving up control of my paycheck though, so I just bite my tongue and hand it over." Pam later indicated: "And then there are days when I look at him and can tell his mind is off in [Cindy Erwin] land again. He always apologizes because he knows it's over for her. But it's really hard for me to watch because I know if she gave him a chance he'd be gone."

In an e-mail to her sisters in June 2001, Pam wrote, "Try to forget that he may have hit me[.]" In another e-mail to her sisters, dated June 24, 2005, Pam wrote:

> We are to the point that I've told him this just isn't working anymore, he's still sneaking around seeing [Erwin] and people are starting to talk. I can't keep up the appearances anymore and pretend that everything is okay. We can't make it to fall and have a quiet split anymore, so I've told him he needs to leave. I . . . spoke with an attorney this morning to see what else I need to think of.

Pam also had substantial correspondence with Erwin. In a May 2005 e-mail, Pam wrote to Erwin stating "I wish he wouldn't have told you how bad our fighting becomes. Neither one of us is proud of that and I had hoped to keep it just between us." In a June 2005 e-mail to Erwin, Pam wrote: "I know how you two feel about each other and I know you're not going to stay away from each other, you'll keep stealing moments, so what's the plan?" In an August 2005 e-mail to Erwin, Pam wrote:

> Monday afternoon, he head butted me in the nose and then a minute later asked what's wrong with me and when I told him, he didn't remember that he'd hit me. I think that was the final straw. . . . I'm tired of physically being hurt. . . . Tell him to stop threatening me that he's going to make the divorce so messy we lose everything. . . . [I]f he's going to keep making threats and tell me he's going to fight dirty, I have the backing of my family to fight back. Does the patrol want an abusing, controlling bully for an officer? Or one who openly cheats on his wife?

(continued . . .)

-23-

[¶44.]    The State also moved to admit other acts evidence. This evidence reflected Huber's alleged emotional, verbal and physical abuse of Pam, as well as his extramarital affairs. Family members and friends proffered evidence of: Huber's admissions of abuse, a cassette tape recording of an argument between Huber and Pam in February 1997,[8] Pam's written and oral statements regarding the alleged abuse, and physical evidence of abuse.

[¶45.]    The circuit court addressed the motions together, ultimately allowing both types of evidence. With respect to other acts evidence, the court ruled:

_____

(. . . continued)
In a September 23, 2007 e-mail, after Joy's ex-husband filed a protection order against Huber, Pam wrote to Erwin:

> [Huber] is suffering serious depression over this. . . . This is all a real mess. Adding to his depression is [that you have sold] your house. He knows your [sic] leaving now and that bothers him. A lot.

And, on October 17, 2007, less than two weeks before the shooting, Pam e-mailed Erwin that Huber is "on Oxycodone for pain and Alprazolam to help him sleep. He's been going through a lot of beer. The girls and I hate it. . . . He's unemployed, worried about finding something else[.]"

Finally, in an undated letter to Huber, Pam wrote: "Maybe I wanted you to know what it feels [like] when you throw things around and grab me by the neck[.] It really hurts when you start talking about divorce and taking the girls away. I don't want that to happen, I really do believe that we can work things out and be a family."

8.    The subject of this recorded argument concerned family finances. Prior to the recording, Pam apparently threw an object at Huber that struck him. Huber then turned the cassette recorder on and the argument continued. While recording, Huber told Pam that if things did not change, he might move to Miller and take their daughters with him. The tape also contains a discussion about physical violence between the two.

> The first thing that the court has to determine is whether the State has met [its]burden of proving by a preponderance of the evidence that the evidence is relevant. . . . The court finds this evidence clearly is relevant. It does make what happened, the charge of murder, more or less likely. The next question then . . . should it be excluded because it either has unfair prejudice, confusion or waste of time? And I believe the defense has the responsibility of going forward with that evidence. And of course, we all know that the court has to, in each case, balance the probative value of the evidence and see if it's significantly outweighed by unfair prejudice. The court is of the belief that past conduct is especially relevant in murder cases involving a domestic situation.

[¶46.]     With respect to hearsay, the court ruled: "[t]he question then becomes do we let it in because the person making these statements is deceased?" After noting that the proffered statements were non-testimonial, the court found that "all of the statements proffered by the State fall within the state of mind hearsay [rule] in SDCL 19-16-7 (Rule 803(3))." The court orally stated that since the "testimony and evidence [was] firmly rooted [as] an established exception to the hearsay rule, the court [did] not need to address the particular guarantees of trustworthiness" (which was necessary for the residual hearsay exception). The court later entered separate findings of fact and conclusions of law granting both motions.

*Hearsay - Pam's Statements*

[¶47.]     Hearsay is a declarant's out-of-court statement offered to prove the truth of the matter asserted. SDCL 19-16-1(3) (Rule 801(c)). Two hearsay rules apply in this case: SDCL 19-16-7 (Rule 803(3)), regarding state of mind; and SDCL 19-16-35 (Rule 804(b)(6)), the residual hearsay exception. In reviewing this issue, we "uphold the decision of the [circuit] court unless it is clear that the court abused

its discretion in admitting the hearsay evidence." State v. Davi, 504 NW2d 844, 849 (SD 1993).

[¶48.]    "A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition, such as intent, plan, motive, design, mental feeling, pain, and bodily health[ ]" is not hearsay. SDCL 19-16-7 (Rule 803(3)). The party seeking admission must show: (1) the statements are contemporaneous with the mental state sought to be proven; (2) there exists no circumstances suggesting a motive for the declarant to fabricate or misrepresent her thoughts; and (3) the declarant's state of mind must be relevant to the issues of the case. 2 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 803.05[2][a] (Joseph M. McLaughlin, ed., Matthew Bender 2d ed. 2009).

[¶49.]    Huber argues that Pam's statements were not evidence of her "then existing state of mind," but rather Pam's narrative of the state of the marriage over several years. *See* State v. Lathan, 138 NCApp 234, 240, 530 SE2d 615, 621 (2000) ("[W]here a statement was made in isolation, unaccompanied by a description of emotion, courts have tended to find that hearsay testimony relating that statement falls outside the scope of Rule 803(3). Conversely, where the witness described the victim's demeanor or attitude when making the statement, the courts have tended to admit the testimony pursuant to 803(3)."). The State argues that Pam's statements were admissible because they reflected her contemporaneous mental, physical, or emotional condition as it related to (1) her relationship with Huber; (2) her fear of Huber; (3) Huber's physical abuse of Pam; and (4) both parties' intentions regarding divorce or separation.

[¶50.] The State proffered over fifty state-of-mind statements, many of which were actually several statements contained in lengthy e-mails. In its findings of fact and conclusions of law, the court stated that it considered each statement individually, but the court's findings do not provide a basis for review of each statement under the state of mind hearsay rule.[9] Rather, the court merely concluded that "all of the statements fall within the hearsay exception set forth in SDCL 19-16-7[.]" Our review of the State's motion indicates that not all of Pam's proffered statements reflected her *contemporaneous* emotional or mental condition. We therefore consider the admissibility of Pam's statements under the residual hearsay exception.[10]

---

9. Notable exceptions are that in its findings of fact and conclusions of law, the circuit court allowed some statements (¶¶ 4 and 20 of the State's motion to admit Pam's statements and Exhibit 1 attached to the State's motion to introduce other acts) as excited utterances, SDCL 19-16-6 (Rule 803(2)). The court allowed other statements (¶¶ 16, 38-41 of the State's motion to admit Pam's statements) finding that they pertained to financial or contractual matters between Huber and Pam, as well as business transactions pertaining to their workplace, and that they were not hearsay because they were not offered to prove the truth of the matter asserted. Finally, the court concluded that "any [of Huber's statements] which are included within [Pam's] proffered statements are not hearsay and are therefore admissible [as an admission by a party opponent] pursuant to SDCL 19-16-3(1) [Rule 801(d)(2)(1)]." With regard to admission under the state of mind exception, however, the court did not address individual statements.

10. Huber argues that Pam's statements regarding her state of mind were not relevant to the issue in the case; i.e., whether Huber's shooting was accidental. We disagree. In *State v. Aesoph*, 2002 SD 71, ¶ 41, 647 NW2d 743, 757, we observed that "[i]t is well understood that a murder victim's statements regarding fear of the accused, are admissible to rebut a defendant's claim of accidental death." The nature of the relationship is relevant to whether the shooting was intentional or accidental because "[d]omestic abuse often has a history highly relevant to the truth-finding process." State v. Laible, 1999 SD 58, ¶ 21, 594 NW2d 328, 335. "When an

(continued . . .)

*The Residual Exception*

[¶51.]     In its oral decision, the court did not rule that Pam's statements were admissible under the residual hearsay exception. The State, however, proposed findings and conclusions, which the court ultimately adopted, finding that the statements were admissible under this exception. Huber did not object to these findings or conclusions, which in most instances precludes appellate review. Nevertheless, Huber now argues that the circuit court should be bound to its limited oral decision from the bench. We rejected this argument in *Feldhaus v. Schreiner*, 2002 SD 65, ¶ 13, 646 NW2d 753, 756, noting that:

> SDCL 15-6-52(a) is designed to give each of the parties one last opportunity to convince the court of its position. Irrevocably binding the court to any position it considers during trial would defeat this purpose . . . and render [the statute] meaningless.

Therefore, the circuit court was not bound to its oral decision, and it was authorized to adopt findings regarding the residual hearsay exception. We now review those

---

(. . . continued)

accused had a close relationship with the victim, prior aggression, threats or abusive treatment of the same victim by the same perpetrator are admissible when offered on relevant" issues such as motive. *Id*. "The rationale for admissibility is that an accused's past conduct in a familial context tends to explain later interactions between the same persons." *Id*. Thus, a statement that "describes the emotional, physical, and verbal abusive acts by the defendant towards the victim and his controlling nature is relevant to show . . . the state of mind of both the victim and the Defendant." *Aesoph*, 2002 SD 71, ¶ 40, 647 NW2d at 756-57. Moreover, "[t]he victim's statement indicating the parties were separated or separating '[bears] directly on the relationship between the victim and defendant at the time of the killing and [is therefore] relevant to show [the defendant's] motive [state of mind] for the killing.'" State v. Murillo, 349 NC 573, 586-87, 509 SE2d 752, 760 (1998) (citation omitted). Therefore, the statements were relevant and on remand, the circuit court may reevaluate whether the statements reflected contemporaneous statements of mental state.

findings to determine whether Pam's statements were admissible under the residual hearsay exception.

[¶52.]     The residual hearsay exception provides in part:

> A statement not specifically covered by any of §§ 19-16-30 to 19-16-34, inclusive, but having equivalent circumstantial guarantees of trustworthiness, is not excluded by § 19-16-4 if the declarant is unavailable as a witness and if the court determines that
>
> (1)     the statement is offered as evidence of a material fact;
> (2)     the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and
> (3)     the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

SDCL 19-16-35 (Rule 804(b)(6)). "The primary requirement of SDCL 19-16-35 [(Rule 804(b)(6)] is that the declarant be unavailable to testify at trial." *Davi*, 504 NW2d at 849. In addition to the other statutory requirements, and to establish that the statements bear the appropriate guarantee of trustworthiness, a circuit court should consider (1) the written or oral nature of the evidence, (2) the character of the statements, (3) the relationship between the declarant and the witness, (4) the declarant's motivation, and (5) the circumstances under which the statements were made. *Id.*

[¶53.]     In its findings, the court noted: (1) Pam was not available to testify against Huber, (2) the majority of the statements were in written form, (3) her statements provided private insights into the history of the marriage, (4) her statements were made to people that she trusted or with women with whom Huber was having an affair, (5) her motivation for her statements concerned her struggle

with handling issues in their marriage, (6) her statements were relevant to Huber's intent and motive and also to rebut Huber's claim that the shooting was accidental, and (7) her statements were more probative for the points for which they were offered than any other evidence that could be obtained through reasonable efforts. We find no error in the court's alternative ground for admission of the statements.[11]

[¶54.]    Huber finally argues that the volume of material introduced resulted in unfair prejudice. Although voluminous, most of Pam's statements reflected the nature of her relationship with Huber, which was highly probative in establishing Huber's motive, intent, and lack of accident with respect to the shooting. Further, evidence is not prejudicial "merely because its legitimate probative force damages the defendant's case." State v. Bunger, 2001 SD 116, ¶ 13, 633 NW2d 606, 610. The circuit court did not abuse its discretion in admitting Pam's statements under SDCL 19-16-35 (Rule 804(b)(6)).

*Other Acts*

[¶55.]    We now turn to Huber's last argument that the court erred in admitting evidence of his prior acts.[12] "In reviewing a trial court's decision to admit

---

11.    We also note that Huber did not argue to this Court that Pam's statements do not qualify under the residual hearsay rule. Rather, Huber's only argument on appeal is that the circuit court should be bound to its oral decision from the bench.

12.    Similar to the State's motion to admit Pam's statements, this motion is lengthy: fifty pages, including exhibits. This motion also contains several e-mails between Pam and Erwin regarding Huber's affair with Erwin and Huber's abuse of Pam.

      In an e-mail from Huber to Pam dated June 1, 2005, Huber stated, "I know I've hurt you both physically and mentally, I'm sorry for that."

(continued . . .)

other acts evidence this Court will not overrule the trial court's decision unless there is an abuse of discretion." State v. Jolley, 2003 SD 5, ¶ 5, 656 NW2d 305, 307 (citations omitted). "'Upon review . . . we must be careful not to substitute our reasoning for that of the trial court.' Thus, the question is not whether, had we been the trial judge, would we have admitted the prior . . . acts evidence but whether the trial court sitting in this case abused its discretion by doing so." State v. Janklow, 2005 SD 25, ¶ 31, 693 NW2d 685, 697 (citation omitted).

[¶56.]      SDCL 19-12-5 (Rule 404(b)) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other

---

(. . . continued)

> A clinical note regarding Huber's October 3, 2006 visit to the VA hospital states: "[Huber] complains that he has been losing his temper more regularly. . . . He describes times in which he has been physically violent towards those around him, including . . . his wife[.]"
>
> Cathy Kerr, who worked at a local bank, stated that in March 2007, Kerr noticed Pam had a black eye when she came into the bank. Pam told Kerr that Huber was handing her some boxes from a rafter when a box slipped and struck her in the eye.
>
> Mary Knox, a friend of Pam's, stated that she saw Pam with a black eye in March 2007. Pam told Knox that she slipped and struck a door knob. Knox also testified that she saw Pam with a second black eye, but could not recall the timeframe.
>
> LaNett Genzler, a friend of Pam's, stated that she saw Pam with a black eye in 2006 and the fall of 2007.
>
> Hubers' neighbor, Brenda Shore, stated that she saw Pam with a black eye in 2007. Shore also stated Huber once called Pam a "dumb bitch" and had, in other instances, yelled at Pam. Patty Mills, another neighbor, stated that while putting up Christmas lights in November 2002, Huber called Pam "every name in the book and [swore] at her."

> purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

"To determine the admissibility of other acts evidence, the court must . . . determine: (1) whether the intended purpose is relevant to some material issue in the case, and (2) whether the probative value of the evidence is substantially outweighed by its prejudicial effect." *Janklow*, 2005 SD 25, ¶ 34, 693 NW2d at 697. The other acts rule is one of "inclusion, not exclusion. Relevant other acts evidence [is] admissible for [any] purpose [ ] other than proving the character of the defendant or his propensity to act in conformity therewith." *Id.* ¶ 33, 693 NW2d at 697.

[¶57.]     The circuit court determined that the other acts evidence was relevant in that "it does make what happened, the charge of murder, more or less likely." With regard to abuse, the court correctly observed that "the evidence of past abusive conduct in a domestic situation is highly relevant in murder cases." *See* State v. Laible, 1999 SD 58, 594 NW2d 328; State v. Kerkhove, 423 NW2d 160 (1988); *Davi,* 504 NW2d 844. With respect to the marital relationship, the jury was entitled to a picture of the nature of the Hubers' marriage. As we have previously stated, "[a] [d]efendant [is] certainly not entitled to have the jury decide his case on a pretense that his behavior and feelings toward [the victim] [are] nothing but routinely warm and affectionate." *Laible,* 1999 SD 58, ¶ 23, 594 NW2d at 335. The court concluded that all of the evidence was relevant to explain both Pam's and Huber's state of mind, and to prove Huber's motive, intent, and absence of accident. We agree.

[¶58.]     Huber, however, argues that the evidence of abuse and extramarital affairs was not relevant as it was not closely connected in time to Pam's death. The circuit court observed that "the [ ] remoteness is not particularly significant . . . because we're talking about an entire eighteen years together." The court explained:

> Remoteness is not significant when considering the relevance of such evidence in a murder case involving a domestic situation. Events occurring during the entire span of the marriage are relevant to establishing the relationship between the parties which is material to [Huber's] motive and intent, and specifically whether the shooting in question was accidental or intentional. Evidence of extramarital affairs [has] also been found to be relevant to prove a defendant's motive and intent in murder cases. *See* State v. Andriano, 161 P3d 540 (Ariz 2007); People v. Houston, 29 CalRptr3d 818, 841 (CalCtApp 2005); State v. Rhodes, 627 NW2d 74 (Minn 2001); Commonwealth v. Demarco, 830 NE2d 1068 (Mass 2005); Andrew v. State, 164 P3d 176 (OklaCrimApp 2007); State v. DiBartolo, 2000 WL 968474 (WashCtApp 2000).

The court further found the marital affairs were relevant because "[t]he possibility that these affairs would be utilized by Pam in a divorce action had numerous potential adverse consequences for [Huber]." Finally, regarding Huber's "attempted affair" with Tiffany Joy, the court found the evidence relevant as it explained the loss of Huber's job in Miller, which further explained Huber's depression and behavioral changes that bore directly on his state of mind at the time of the shooting. We see no abuse of discretion in the court's relevancy determination. Courts consistently allow such evidence spanning the entire marriage in order to show malice, intent, and ill will toward the victim. *Murillo*, 349 NC at 591, 509 SE2d at 763. The circuit court did not err in finding Huber's other acts relevant.

[¶59.] "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." SDCL 19-12-3 (Rule 403). However, once a circuit court finds other acts evidence relevant, "the balance tips emphatically in favor of admission[.]" *Janklow*, 2005 SD ¶ 38, 693 NW2d at 698. The party who objects to the admission of the other acts evidence bears "the burden of establishing that the trial concerns expressed in [SDCL 19-12-3] [(Rule 403)] substantially outweighs the probative value of the evidence." *Id.* Mere damage to a defendant's position is not a basis for exclusion:

> To exclude relevant evidence because it might also raise the
> forbidden character inference ignores the reality that "[a]lmost
> *any* bad act evidence simultaneously condemns by besmirching
> character and by showing one or more of 'motive, opportunity,
> intent, preparation, plan, knowledge, identity, or absence of
> mistake or accident,' not to mention the 'other purposes' of
> which this list is meant to be illustrative."

State v. Wright, 1999 SD 50, ¶ 15, 593 NW2d 792, 799 (citation omitted).

[¶60.] Huber argues that the other acts evidence was substantially more prejudicial than probative. We disagree. As the circuit court concluded, "the totality of the evidence, including the fact that several stressful events were going on in [Huber's] life immediately preceding Pam's shooting, increase[d] the probative value of this evidence to prove [Huber's] motive, intent and absence of accident." We also agree with the court's conclusion that "any concerns of unfair prejudice, confusion, or delay [were] substantially outweighed by the highly probative nature of the proffered evidence." Further, the fact that the other acts evidence is

damaging does not render the evidence substantially more prejudicial than probative. Finally, the circuit court gave the appropriate, precisely tailored cautionary instruction before admitting the other acts evidence.[13] We agree that Huber failed to establish that any prejudice from this evidence substantially outweighed its probative value. The circuit court did not abuse its discretion in admitting the other acts evidence.

*Conclusion*

[¶61.] We find no abuse of discretion in the circuit court's: admission of the State's expert's opinions; exclusion of the Meade County incident; admission of Pam's out-of-court statements under the residual hearsay exception; and, admission of Huber's other acts. However, the circuit court erred in excluding Dr. Enoka's testimony to rebut the State's case and to support Huber's accidental discharge defense.

[¶62.] Reversed and remanded for a new trial.

---

13. The court instructed:

> Ladies and gentlemen, you're about to hear evidence that the Defendant may have previously abused his wife. Although such evidence is allowed for some purposes, you may not use this evidence to decide whether the Defendant carried out the physical acts involved in the crime charged. You may only consider the evidence to determine motive, intent, or absence of accident. Before determining whether you consider this evidence, you must first determine if a preponderance of the evidence establishes that the Defendant committed the other acts alleged. You are not required to consider this evidence and whether you do so or not is a matter within your exclusive province.

#25116

[¶63.] GILBERTSON, Chief Justice and KONENKAMP, Justice and MYREN, Circuit Court Judge, and MILLER, Retired Justice, concur.

[¶64.] MYREN, Circuit Court Judge, sitting for SEVERSON, Justice, disqualified, and MILLER, Retired Justice, sitting for MEIERHENRY, Justice, disqualified.