#26346-aff in part, rev & rem in part-DG

**2013 S.D. 60**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                          Plaintiff and Appellee,

  v.

GABRIEL DARRYN
MEDICINE EAGLE,                                 Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
TRIPP COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE JOHN L. BROWN
Judge

* * * *

MARTY J. JACKLEY
Attorney General

KIRSTEN E. JASPER
Assistant Attorney General
Pierre, South Dakota                            Attorneys for plaintiff
                                                and appellee.


PAUL E. JENSEN of
Jensen & Massa
Winner, South Dakota

                                                Attorneys for defendant
                                                and appellant.

* * * *

ARGUED MARCH 19, 2013

OPINION FILED **08/07/13**

#26346

GILBERTSON, Chief Justice

[¶1.] M.E.H. alleges she was kidnapped and raped by Gabriel Darryn Medicine Eagle, Junior, on September 23, 2000. In 2001, Medicine Eagle was indicted, but the charges were later dismissed when DNA testing failed to implicate Medicine Eagle. In 2008, the case was reopened and the evidence obtained in 2000 was retested using a new method of DNA testing. This time, the testing revealed the presence of Medicine Eagle's DNA. On December 3, 2009, the grand jury indicted Medicine Eagle on various charges stemming from the alleged rape. Further, a Part II Information was filed charging Medicine Eagle as a habitual offender pursuant to SDCL 22-7-7. At trial, the court admitted evidence of an incident involving Medicine Eagle and S.M., which allegedly occurred in 2003, as other acts evidence pursuant to SDCL 19-12-5 (Rule 404(b)). Additionally, the trial court permitted the State to elicit testimony from a forensic DNA analyst regarding the results of DNA testing performed in 2008 and 2011, even though some steps of the testing were performed by nontestifying analysts. The jury found Medicine Eagle guilty of one count of rape in the second degree, one count of rape in the third degree, sexual contact with a child under age 16, and kidnapping. In a separate trial, the jury found that Medicine Eagle was a habitual offender. Medicine Eagle appeals.

**FACTS**

[¶2.] On September 23, 2000, 15-year-old M.E.H. was in Winner, South Dakota, to attend a funeral. M.E.H. was staying with her grandmother, who lived in a housing development just outside of Winner. At approximately 6:00 p.m.,

-1-

M.E.H. had sexual intercourse with her 16-year-old boyfriend Patrick Red Bird while the two were alone at the house. Shortly thereafter, M.E.H., her brother, her cousin, and her friend left the house and walked to town. At approximately 10:30 p.m., M.E.H. began walking home in order to make her 11:00 p.m. curfew.

[¶3.]     M.E.H. alleges that while she was walking home, 23-year-old Medicine Eagle and his passenger approached her in Medicine Eagle's van and offered to give her a ride home. M.E.H. recognized the passenger, and accepted the ride. M.E.H. claims Medicine Eagle proceeded to drop the passenger off at his home. After dropping the passenger off, M.E.H. claims Medicine Eagle drove back into town to buy beer at a gas station and then drove to the bowling alley so M.E.H. could look for her cousin. When M.E.H. was unable to locate her cousin, she got back in Medicine Eagle's vehicle so that he could take her home. At this point, M.E.H. alleges Medicine Eagle began driving erratically. Despite her repeated requests to be taken home, M.E.H. asserts Medicine Eagle drove to a desolate field outside of Winner. Upon reaching the field, M.E.H. alleges she tried to run away from the van to get help. However, M.E.H. claims Medicine Eagle caught her and dragged her back to the van by her hair. M.E.H. alleges Medicine Eagle then forced her into the van and raped her. According to M.E.H., Medicine Eagle threatened her throughout the incident. M.E.H. claims Medicine Eagle drove her home after the rape. Medicine Eagle disputes these allegations.

[¶4.]     When M.E.H. arrived at home, she told her mother she had been raped. At 2:00 a.m. on September 24, 2000, M.E.H. was taken to the hospital, where she was examined and a rape kit was collected. The rape kit evidence and

M.E.H.'s clothing were subsequently sent to the South Dakota State Forensic Laboratory for testing. After M.E.H. was discharged from the hospital, she was interviewed by law enforcement. At this point in time, she did not inform law enforcement that she had sexual intercourse with Red Bird prior to the alleged rape. In 2001, Medicine Eagle was indicted on charges stemming from the alleged rape.

[¶5.] At the South Dakota State Forensic Laboratory, criminalist Stacy Smith conducted serology testing to check for the presence of bodily fluids on the evidence. While conducting the testing, Smith established the presence of bodily fluids on the vaginal swab and the underwear that were collected as part of M.E.H.'s rape kit. However, prior to 2002, the South Dakota State Forensic Laboratory did not do DNA testing. As a result, Smith sent M.E.H.'s vaginal swab, Medicine Eagle's buccal swab, and M.E.H.'s blood sample to the Orchid Cellmark (formerly known as GeneScreen) lab in Texas for DNA testing.

[¶6.] At the time, Amber Moss worked at Orchid Cellmark (Cellmark) as a forensic scientist. In August 2001, Moss received the evidence sent by Smith. Moss performed DNA testing on the vaginal swab, and compared it to the DNA profiles obtained from Medicine Eagle's buccal swab and M.E.H.'s blood sample. The only DNA profile Moss was able to obtain during the testing was consistent with M.E.H.'s DNA profile. Moss sent these results to Smith at the South Dakota State Forensic Laboratory.

[¶7.] Shortly thereafter, Smith sent a cutting from M.E.H.'s underwear to Cellmark for DNA testing. Moss performed DNA testing on the sample and

compared the DNA profiles obtained from the underwear cutting to the DNA profiles of M.E.H. and Medicine Eagle. Medicine Eagle was not implicated by the results of this round of DNA testing. Instead, the only male DNA profile Moss was able to obtain was from an unknown male individual. Upon completion of the testing, Cellmark retained the extractions from M.E.H.'s vaginal swab and M.E.H.'s underwear cutting in a secured area at the lab.

[¶8.]     Because the DNA testing failed to implicate Medicine Eagle and instead revealed the presence of DNA from an unidentified male, the charges against Medicine Eagle were dismissed. In 2008, the case was reopened after law enforcement learned M.E.H. had been sexually involved with Red Bird on the day of the alleged rape. Using the DNA index system known as CODIS, Smith was able to match the DNA profile of the unidentified male that was obtained by Cellmark in 2001 to Red Bird. Smith then made inquiries about whether a new DNA-testing method known as Y-STR testing, which was unavailable when the evidence was originally tested in 2001, might produce additional results. The South Dakota State Forensic Laboratory did not do Y-STR testing at this point in time, so Smith contacted Cellmark to perform the testing.

[¶9.]     In 2008, Cellmark was asked to perform Y-STR testing on the vaginal swab DNA extract and the underwear cutting DNA extract that Cellmark had retained from the 2001 DNA testing and to compare those extracts to Red Bird's DNA profile and Medicine Eagle's DNA profile. Barbara Leal, a forensic DNA analyst, performed the quantitation, dilution, and amplification steps on the

#26346

extracts.[1]  As Cellmark used a team approach to DNA testing, the additional steps

associated with the Y-STR testing were performed by other analysts.  The results of

the Y-STR testing revealed that Medicine Eagle could not be excluded as a

contributor to the non-sperm cell fraction of the vaginal swab or the non-sperm cell

fraction of the underwear cutting.[2]  In May 2011, Cellmark was also asked to

perform Y-STR testing on M.E.H.'s bra, which Cellmark received from Smith.  Leal

performed the dilution and amplification steps of the Y-STR testing on the bra

sample.  Additionally, Leal completed the analysis of the results and wrote a report

containing her conclusions.  The results of the Y-STR testing of the bra sample

established that Medicine Eagle could not be excluded as a contributor to the

---

1.     At trial, Moss generally described the DNA testing process.  She testified that the first step in the process is known as extraction, which is the process by which DNA present in the sample is purified.  She indicated that the second step is quantitation, which establishes the amount of DNA present in the sample.  Moss explained that the third step is amplification, which is the process by which millions of copies of the segments of DNA being tested are made.  Moss testified that after amplification, the amplified product is put into a genetic analyzer, and analysis software is used to produce the DNA profile associated with the sample.  Moss explained that the same process is then repeated with the known samples from the suspect and victim to produce those DNA profiles.  After obtaining DNA profiles from the evidence and the known samples, the profiles are then compared to determine if there is a match, and if there is a match, statistical analysis is performed.  Leal testified that the Y-STR testing process is similar to the process Moss described.  Leal explained that the two main differences associated with Y-STR testing are that in Y-STR testing only the male DNA is quantitated, and during the copying portion of Y-STR testing, only the Y chromosomes are examined.  Additionally, with regard to the DNA testing process, Leal testified that the dilution step is performed to dilute any DNA with water prior to amplification.

2.     Leal did not write the original report in 2008 containing these results. However, Leal later independently reviewed the report, analyzed the results, and reached her own conclusions regarding whether Medicine Eagle or Red Bird could be excluded as contributors to the samples.

sample. As to each of these samples, Leal's statistical analyses indicated that although Medicine Eagle could not be excluded as a contributor, 99.97 percent of paternally unrelated males would be excluded as contributors to the samples.

[¶10.] On December 3, 2009, the grand jury indicted Medicine Eagle on four counts of second-degree rape, three counts of third-degree rape, one count of sexual contact with a child under age 16, and four counts of kidnapping as a result of the incident that allegedly occurred between Medicine Eagle and M.E.H. in September 2000. Additionally, on July 14, 2010, the State filed a Part II Information charging Medicine Eagle as a habitual offender pursuant to SDCL 22-7-7, because Medicine Eagle had a prior felony conviction. Medicine Eagle was arraigned on the charges on August 3, 2010, and pleaded not guilty.

[¶11.] Prior to trial, the parties filed various motions. On July 21, 2011, the State filed a motion to introduce other acts evidence pursuant to SDCL 19-12-5 (Rule 404(b)), based on an incident that allegedly occurred between Medicine Eagle and thirteen-year-old S.M. on January 29, 2003. S.M. alleged that on that date Medicine Eagle called her home at approximately 4:00 a.m. looking for her sister. According to S.M., Medicine Eagle told her that her mother needed help at work. S.M. claimed Medicine Eagle said he was at the house next door and offered to give her a ride. S.M. did not personally know Medicine Eagle, but she accepted the ride because Medicine Eagle knew her sister. S.M. claimed Medicine Eagle's driving was erratic, and that he forced her to drink vodka while they were driving. Additionally, instead of taking S.M. to her mother, S.M. alleged Medicine Eagle drove to a field outside of town. Once the vehicle stopped and S.M. tried to run

away, S.M. claimed Medicine Eagle grabbed her, dragged her back to his vehicle by her hair, and engaged in sexual contact with her. S.M. asserted the attack ended when she told Medicine Eagle she was going to tell her mom about what happened, and she became physically ill. S.M. claimed Medicine Eagle then drove her home. However, S.M. asserted Medicine Eagle threatened to kill her if she told anyone about the incident. The trial court granted the State's motion and allowed the State to present this evidence to the jury pursuant to SDCL 19-12-5 (Rule 404(b))'s plan exception.

[¶12.] On September 29, 2011, the State filed a notice of its intent to offer witness testimony regarding the DNA evidence. In addition to testimony from Smith, Moss, and other witnesses, the State sought to introduce testimony from Leal regarding the Y-STR testing performed in 2008 and 2011. Medicine Eagle objected to this testimony, arguing it violated his Sixth Amendment right to confront the witnesses against him because other analysts that performed some steps of the DNA testing in 2008 and 2011 were not being called as witnesses. The trial court rejected Medicine Eagle's objections to this testimony.

[¶13.] Medicine Eagle's jury trial commenced on October 11, 2011. On October 18, 2011, the jury returned a verdict finding Medicine Eagle guilty of one count of rape in the second degree, one count of rape in the third degree, sexual contact with a child under age 16, and kidnapping. On October 24, 2011, the State filed an Amended Part II Information for Habitual Offender alleging that Medicine Eagle had a second prior felony conviction. Medicine Eagle was then rearraigned on the Amended Part II Information. However, the State later dismissed the Amended

Part II Information after discovering that the second "prior" felony conviction actually occurred after the principal offense.[3] The State then proceeded to trial on the original Part II Information, to which Medicine Eagle made no objection. The jury returned a verdict on January 27, 2012, finding that Medicine Eagle was a habitual offender.

[¶14.] On February 13, 2012, Medicine Eagle filed a motion to vacate the part II proceedings, arguing that the trial court had no jurisdiction over the part II proceedings. Medicine Eagle claimed the State's filing of the Amended Part II Information dismissed the original Part II Information. Thus, he asserted that because the State failed to file a second Amended Part II Information or refile the original Part II Information, no part II information even existed at the time of the habitual offender jury trial. The trial court denied the motion. Medicine Eagle received sentences of 25 years in the South Dakota State Penitentiary for rape in the second degree, 15 years for sexual contact with a child under age 16, and life imprisonment for kidnapping. Medicine Eagle appeals the trial court's admission of the other acts evidence, admission of Leal's testimony regarding the results of the Y-STR testing conducted in 2008 and 2011, and its denial of his motion to vacate the part II proceedings.

**ANALYSIS AND DECISION**

[¶15.] **1. Whether the trial court abused its discretion in admitting evidence of the incident involving S.M. as other acts evidence pursuant to SDCL 19-12-5 (Rule 404(b)).**

---

3. The State's dismissal of the Amended Part II Information explicitly stated that "[t]he State does **not** dismiss the original Part II and intends to proceed with that original Part II at the trial on such matter."

[¶16.] "A trial court's determination to admit other acts evidence will not be overruled absent an abuse of discretion." *State v. Mattson*, 2005 S.D. 71, ¶ 21, 698 N.W.2d 538, 546 (quoting *State v. Anderson*, 2000 S.D. 45, ¶ 93, 608 N.W.2d 644, 670). "An abuse of discretion is 'discretion exercised to an end or purpose not justified by and clearly against, reason and evidence.'" *State v. Big Crow*, 2009 S.D. 87, ¶ 7, 773 N.W.2d 810, 812 (quoting *State v. Machmuller*, 2001 S.D. 82, ¶ 9, 630 N.W.2d 495, 498). The admission of other acts evidence is governed by SDCL 19-12-5 (Rule 404(b)), which provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

[¶17.] "To determine the admissibility of other acts evidence, the court must . . . determine: (1) whether the intended purpose is relevant to some material issue in the case, and (2) whether the probative value of the evidence is substantially outweighed by its prejudicial effect." *State v. Huber*, 2010 S.D. 63, ¶ 56, 789 N.W.2d 283, 301 (quoting *State v. Janklow*, 2005 S.D. 25, ¶ 34, 693 N.W.2d 685, 697). This Court has previously determined that SDCL 19-12-5 (Rule 404(b)) is a rule of inclusion, as opposed to exclusion.[4] *State v. Wright*, 1999 S.D. 50, ¶ 13, 593 N.W.2d

---

4.  Specifically, in *State v. Wright*, this Court acknowledged SDCL 19-12-5 (Rule 404(b)) was previously viewed as a rule of exclusion, as opposed to inclusion. 1999 S.D. 50, ¶ 13, 593 N.W.2d at 797-98 (explaining that "[i]n the past, we stressed that 'generally, evidence of crimes or acts other than the ones with which the defendant is charged are inadmissible, unless an exception applies'"). However, in *Wright*, this Court clarified that SDCL 19-12-5 (Rule 404(b)) is a rule of inclusion, stating that "no preliminary showing is

(continued . . .)

792, 798. "[O]nce a circuit court finds other acts evidence relevant, 'the balance tips emphatically in favor of admission.'" *Huber*, 2010 S.D. 63, ¶ 59, 789 N.W.2d at 302 (quoting *Janklow*, 2005 S.D. 25, ¶ 38, 693 N.W.2d at 698). Further, "[m]ere damage to a defendant's position is not a basis for exclusion[.]" *Id.* Essentially, "[a]ll that is prohibited under § 404(b) is that similar act evidence not be admitted 'solely to prove character.'" *Wright*, 1999 S.D. 50, ¶ 17, 593 N.W.2d at 800 (quoting *Huddleston v. United States*, 485 U.S. 681, 687, 108 S. Ct. 1496, 1500, 99 L. Ed. 2d 771 (1988)).

[¶18.] This Court has previously recognized that evidence of other acts can be admitted under the plan exception "not only where the charged and uncharged acts are part of a single continuing conception or plot, but also where the uncharged misconduct is sufficiently similar to support the inference that they are manifestations of a *common* plan, design, or scheme . . . ." *Big Crow*, 2009 S.D. 87, ¶ 8, 773 N.W.2d at 812 (citing *State v. Champagne*, 422 N.W.2d 840, 842 (S.D. 1988)). "[W]here the defendant denies doing the charged act, evidence of a common plan or scheme to achieve the act is directly relevant to refute this general denial." *State v. Ondricek*, 535 N.W.2d 872, 875 (S.D. 1995) (citing *United States v. Weidman*, 572 F.2d 1199, 1202 (7th Cir. 1978)).

---

(. . . continued)

necessary before such evidence may be introduced for a proper purpose." *Id.* ¶ 13, 593 N.W.2d at 798. Thus, *Wright* rejects the view previously taken in *State v. Chamley* (and subsequently utilized in *State v. Reyes*, 2005 S.D. 46, ¶ 14, 695 N.W.2d 245, 251), which required a showing that "the probative value of the proffered evidence substantially outweighs the danger of unfair prejudice" prior to the admission of other acts evidence (and in essence treated SDCL 19-12-5 (Rule 404(b)) as a rule of exclusion). 1997 S.D. 107, ¶¶ 9-10, 568 N.W.2d 607, 611-12.

[¶19.]     The existence of a plan need not be proven with direct evidence, but instead "can be shown circumstantially[,] with evidence that the defendant committed a series of similar but 'unconnected' acts." *Wright*, 1999 S.D. 50, ¶ 19, 593 N.W.2d at 801 (citing *People v. Ewoldt*, 867 P.2d 757, 768-69 (Cal. 1994)). Essentially, "[a]ll that is required to show a common plan is that the charged and uncharged events 'have sufficient points in common.'" *Id.* ¶ 19, 593 N.W.2d at 800 (citing *United States v. Elizondo*, 920 F.2d 1308, 1320 (7th Cir. 1990)). However, the other acts evidence "must demonstrate 'not merely a similarity in results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.'" *Id.* ¶ 19, 593 N.W.2d at 801 (quoting *Ewoldt*, 867 P.2d at 770).

[¶20.]     In this case, the trial court concluded that evidence of the incident involving S.M. was admissible under SDCL 19-12-5 (Rule 404(b)) to show Medicine Eagle's plan, common scheme, and modus operandi. In admitting the evidence, the trial court concluded that the incidents involving M.E.H. and S.M. were "strikingly similar," and that the incident involving S.M. was relevant to prove that Medicine Eagle "had a common plan or scheme to kidnap, rape, and assault young girl victims he could take advantage of after isolating them by use of his deception, physical threats, and intimidation." Furthermore, the trial court concluded that the incident involving S.M., which occurred approximately two and one-half years after M.E.H. was allegedly kidnapped and raped, was not too remote so as to exclude its admission from trial. Finally, the trial court determined that admission of evidence regarding the incident involving S.M. was not unfairly prejudicial.

[¶21.]     On appeal, Medicine Eagle argues that evidence of the incident involving S.M. was inadmissible for two reasons.  First, Medicine Eagle argues that evidence of the incident involving S.M., which allegedly occurred two and one-half years after Medicine Eagle's commission of the crimes against M.E.H., cannot be used to prove that Medicine Eagle had a plan in 2000.  However, this Court has previously recognized that "[o]ther act evidence does not have to be a prior act to be admissible under SDCL 19-12-5 (Rule 404(b))."  *State v. Toohey*, 2012 S.D. 51, ¶ 20, 816 N.W.2d 120, 129.  Further, in *State v. White*, this Court acknowledged that other jurisdictions have admitted evidence of acts occurring subsequent to the charged offense to prove common plan or scheme.  538 N.W.2d 237, 244 (S.D. 1995) (discussing *State v. Downing*, 511 P.2d 638 (Ariz. 1973) and *State v. Morgan*, 485 P.2d 1371 (Kan. 1971), in which the Supreme Courts of Arizona and Kansas held that evidence of rapes committed after the rapes the defendants were on trial for was admissible to show plan or scheme).[5]  Thus, subsequent acts can be admitted under the plan exception to SDCL 19-12-5 (Rule 404(b)).

---

5.     In addition to the Arizona and Kansas cases specifically recognized in *White*, other jurisdictions have also allowed evidence of acts occurring subsequent to the charged conduct to be admitted as proof of a common scheme or plan.  *See People v. Catlin*, 26 P.3d 357 (Cal. 2001) (evidence regarding defendant's murder of his fifth wife was admissible, in prosecution for first-degree murders of his mother and fourth wife, to show identity and to establish common scheme or plan); *People v. Balcom*, 867 P.2d 777 (Cal. 1994) (holding that evidence that defendant committed uncharged rape and robbery weeks after charged offenses was admissible to prove that charged offenses were manifestations of common design or plan); *State v. Ramsey*, 692 N.W.2d 498 (N.D. 2005) (evidence of subsequent sexual contact was admissible under the plan or absence of mistake or accident exceptions to Rule 404(b)); *State v. Cowley*, 672 S.E.2d 319 (W. Va. 2008) (evidence of burglary and sexual

(continued . . .)

[¶22.]    Second, Medicine Eagle argues evidence of the incident involving S.M. was not admissible under SDCL 19-12-5 (Rule 404(b))'s plan exception because the State did not present evidence to establish that a common plan or scheme actually existed at the time of M.E.H.'s alleged rape in 2000. However, as discussed above, direct proof of the existence of a plan is not necessary. Instead, the existence of a common plan or scheme can be proven circumstantially by establishing that the acts are sufficiently similar. In this case, Medicine Eagle does not argue the incidents involving M.E.H. and S.M. were not similar.[6] Therefore, we need not further address this argument.[7]

[¶23.]    Overall, we conclude that the trial court did not abuse its discretion in admitting evidence of the incident involving S.M. under SDCL 19-12-5 (Rule 404(b)). The record reflects that the trial court made the proper inquiries before admitting the evidence. Additionally, the trial court gave a limiting instruction to

_____

(. . . continued)
assault that occurred six months after burglary and sexual assault defendant was on trial for was admissible to show common plan).

6.    Additionally, Medicine Eagle has not directly challenged the length of time between the kidnapping and rape of M.E.H. in 2000 and the incident involving S.M. in 2003. Regardless, this Court has previously stated that "we have chosen not to set a rigid time limitation when determining whether bad acts are too remote." *Ondricek*, 535 N.W.2d at 877 (concluding that sexual abuse occurring ten years prior to the prosecution was not too remote).

7.    At oral argument, counsel for Medicine Eagle requested that this Court impose a requirement that the jury/judge make a specific finding in cases involving SDCL 19-12-5 (Rule (404(b)), when subsequent acts are used to prove the existence of a common plan or scheme, that the common plan or scheme actually existed at the time of the charged conduct and did not arise later. However, counsel for Medicine Eagle cites no authority for imposing such a requirement.

prevent the jury from misusing the evidence. Specifically, the trial court advised the jury that evidence of the incident involving S.M. could be used "only to show: motive, intent, plan or common scheme. You may not consider it as tending to show in any other respect the defendant's guilt of the offense with which the defendant is charged." Further, the jury was instructed that it was "not required to consider this evidence and whether you do is a matter within your exclusive province."[8] As a result, under the circumstances of this case, the trial court did not err in admitting evidence of the incident involving S.M.

[¶24.]      **2.    Whether Medicine Eagle's rights under the Sixth Amendment's Confrontation Clause were violated when the trial court allowed Barbara Leal to testify about the 2008 and 2011 Y-STR testing even though some steps of the testing were performed by nontestifying analysts.**

[¶25.]      At trial, the State called Leal to testify regarding the 2008 and 2011 Y-STR testing. Leal testified about the different steps she performed during the 2008 and 2011 Y-STR testing. Leal explained that she did not perform every step of the Y-STR testing conducted in 2008 and 2011, as Cellmark utilized a team approach to DNA testing. However, Leal testified that she was familiar with the other steps of the testing and had performed them on other occasions. Additionally, Leal explained that the analysts at Cellmark were trained to follow standard operating

---

8.     In addition, prior to admitting S.M.'s testimony regarding the alleged rape, the trial court instructed the jury:

> You may only consider [evidence of the incident involving S.M.] to determine, motive, plan and common scheme. Before determining whether to consider this evidence, you must first determine if a preponderance of the evidence established that [Medicine Eagle] committed the other acts. You are not required to consider this evidence and whether you do so or not is a matter within your exclusive province.

protocols in conducting DNA testing, and that they were trained to note any discrepancies. Leal testified that because no discrepancies were noted by the analysts that performed the other steps of the Y-STR testing, the standard operating protocols were followed.

[¶26.] Leal also testified about the results of the 2008 and 2011 Y-STR testing, which implicated Medicine Eagle. Leal explained that although she did not create the original 2008 report containing the results of the 2008 testing, she independently reviewed the report, analyzed the results, and reached her own conclusions regarding whether Medicine Eagle or Red Bird could be excluded as contributors to the samples. Leal's conclusions were generally consistent with the conclusions contained in the 2008 report.[9] Additionally, Leal testified about the conclusions she reached regarding the 2011 Y-STR testing, which were consistent with her 2011 report. At trial, neither the 2008 report nor the 2011 report were introduced into evidence through Leal. Instead, the State introduced Exhibit 19, which was a chart containing a summary of Leal's conclusions and statistical calculations for each of the samples tested in 2008 and 2011.[10] On appeal, Medicine Eagle argues his Sixth Amendment right to confront the witnesses against him was violated when the trial court allowed Leal to testify about the results of the 2008

---

9.    However, Leal made one slight modification. The 2008 report indicated that the profile obtained from the non-sperm cell fraction of the underwear cutting was a mixture of at least two males. Leal reviewed the profile and determined that the mixture appeared to be more consistent with originating from two males.

10.    Thus, Medicine Eagle's assertions that the 2008 and 2011 reports were introduced at trial through Leal are not supported by the record.

and 2011 Y-STR testing (and admitted Exhibit 19 containing Leal's conclusions and statistical calculations) because some steps of the testing were performed by nontestifying analysts.

[¶27.]     Alleged violations of constitutional rights are reviewed by this Court under the de novo standard of review. *State v. Johnson*, 2009 S.D. 67, ¶ 10, 771 N.W.2d 360, 365 (citing *State v. Selalla*, 2008 S.D. 3, ¶ 18, 744 N.W.2d 802, 807). "The Sixth Amendment to the United States Constitution, made applicable to the States via the Fourteenth Amendment, provides that 'in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309, 129 S. Ct. 2527, 2531, 174 L. Ed. 2d 314 (2009) (internal citation omitted). In *Crawford v. Washington*, the United States Supreme Court held that under the Sixth Amendment's Confrontation Clause, "[t]estimonial statements of witnesses absent from trial [are admissible] only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." 541 U.S. 36, 59, 124 S. Ct. 1354, 1369, 158 L. Ed. 2d 177 (2004). As we recognized in *State v. Johnson*:

> *Crawford* did not precisely articulate what is considered 'testimonial,' but it provided some guidance. At a minimum, the Court announced, 'testimonial' includes statements made during police interrogations and prior testimony at a preliminary hearing, before a grand jury, or at a former trial. In describing testimonial statements, the Court also noted that testimony is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' Further, the Court offered a non-exclusive list of 'formulations' of the term 'testimonial': (1) 'ex parte in-court testimony or its functional equivalent-that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine . . . ;' (2) 'extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions,

prior testimony, or confessions;' and (3) statements made under circumstances that would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

2009 S.D. 67, ¶ 19, 771 N.W.2d at 368 (internal citations omitted).

[¶28.]     Following *Crawford*, the United States Supreme Court issued two decisions that are relevant to Medicine Eagle's appeal: *Bullcoming v. New Mexico*, ___ U.S. ___, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011) and *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009).[11]  *Melendez-Diaz* was decided by the Court in 2009.  557 U.S. 305, 129 S. Ct. 2527.  In *Melendez-Diaz*, the defendant was charged with distributing and trafficking cocaine.  *Id.* at 308, 129 S. Ct. at 2530.  At trial, the prosecution submitted three notarized "certificates of analysis" containing the results of the forensic analysis performed on the substances seized from the defendant, which established the substances were cocaine.  *Id.* at 308, 129 S. Ct. at 2531.  The defendant objected to the admission of the certificates, arguing that admission of the certificates without testimony from the analysts who tested the seized substances violated his rights under the Confrontation Clause.  *Id.* at 309, 129 S. Ct. at 2531.  The trial court overruled the

---

11.     *Williams v. Illinois*, ___ U.S. ___, 132 S. Ct. 2221, 183 L. Ed. 2d 89 (2012) (plurality opinion), is the United States Supreme Court's most recent decision relevant to Medicine Eagle's Sixth Amendment claim.  In *Williams*, the United States Supreme Court specifically considered an alleged violation of a defendant's Confrontation Clause rights based on the introduction of testimony regarding DNA testing.  ___ U.S. ___, 132 S. Ct. 2221.  However, given the fractured nature of the *Williams* opinion and that no rationale was agreed upon by a majority, *Williams* does not provide this Court with a sound basis for its decision in this case.  *See CTS Corp. v. Dynamics Corp. of Am.* 481 U.S. 69, 81, 107 S. Ct. 1637, 95 L. Ed. 2d 67 (1987) (indicating that plurality opinions, which do not represent the views of a majority of the Court, are not binding precedent).

defendant's objection, and admitted the certificates. *Id.* On appeal, the United States Supreme Court held the certificates were testimonial statements, and the analysts were "witnesses" for purposes of the Sixth Amendment. *Id.* at 312, 129 S. Ct. at 2532. As a result, the Court concluded that the trial court's admission of the certificates without requiring the analysts to be called as witnesses violated the defendant's rights under the Confrontation Clause. *Id.* at 329, 129 S. Ct. at 2542.

[¶29.] *Bullcoming* was decided by the Court in 2011. ___ U.S. ___, 131 S. Ct. 2705. In *Bullcoming*, the defendant was arrested and charged with driving while intoxicated (DWI). *Id.* at ___, 131 S. Ct. 2709. At trial, the prosecution introduced a forensic laboratory report which certified that the defendant's blood alcohol concentration was above the limit for aggravated DWI. *Id.* However, the analyst that signed the report did not testify. *Id.* Instead, the prosecution called an analyst who was familiar with the lab's testing procedures, but had neither participated in nor observed the testing of the defendant's blood sample. *Id.* On appeal, the United States Supreme Court held that the report was testimonial and that admission of the report through an analyst who did not sign the report or perform or observe the testing violated the defendant's rights under the Confrontation Clause. *Id.* at __, 131 S. Ct. 2710. The Court concluded that the "surrogate testimony" did not satisfy constitutional requirements and that the defendant had the right to confront the analyst who certified the report. *Id.*

[¶30.] In support of his claims that the admission of Leal's testimony regarding the 2008 and 2011 Y-STR testing violated his Confrontation Clause rights, Medicine Eagle argues this case is equivalent to *Bullcoming*. Medicine

Eagle asserts Leal essentially offered "surrogate testimony" because she did not perform each step of the Y-STR testing conducted in 2008 and 2011, yet she still testified about the results of the testing. However, the facts of this case are distinguishable from the facts of *Bullcoming* in three key respects. First, unlike in *Bullcoming*, where the nontestifying analyst's report was admitted into evidence, in this case neither the 2008 report nor the 2011 report were even admitted into evidence. Instead, the only exhibits admitted through Leal were her curriculum vitae and the chart she created containing a summary of her independent conclusions and statistical calculations for each sample tested in 2008 and 2011.[12] Second, unlike the analyst in *Bullcoming*, who did not participate in or observe the testing, in this case Leal participated in various steps of both the 2008 and 2011 Y-STR testing. Third, unlike the analyst in *Bullcoming*, who testified about the testing results reached by a nontestifying analyst, in this case Leal did not testify about another analyst's conclusions or the specific contents of the original 2008 report. Instead, Leal only testified about *her own conclusions* from the 2008 and 2011 Y-STR testing and the statistical calculations *she performed*. Therefore, this case is factually distinguishable from *Bullcoming*. For these same reasons, this case is also distinguishable from *Melendez-Diaz*.

[¶31.]     Although *Bullcoming* and *Melendez-Diaz* are factually distinguishable from this case, both *Bullcoming* and *Melendez-Diaz* provide guidance on issues pertinent to Medicine Eagle's claim that his Confrontation Clause rights were

---

12.     Furthermore, Leal created and signed the report regarding the 2011 Y-STR testing. Therefore, even if the 2011 report had been admitted through Leal, its admission would likely have been appropriate under *Bullcoming*.

violated when Leal was permitted to testify about the 2008 and 2011 Y-STR testing even though she did not perform each step of the testing. Therefore, both *Bullcoming* and *Melendez-Diaz* remain relevant to this Court's resolution of Medicine Eagle's Sixth Amendment claim.

[¶32.] Specifically, *Melendez-Diaz* provides some guidance as to who must be called as a witness in order to satisfy a defendant's rights under the Confrontation Clause in cases where testing is performed by multiple individuals. In *Melendez-Diaz*, after holding that the certificates were "testimonial" and that the defendant was entitled to be confronted at trial with the analysts who created the certificates, the Court clarified its holding, stating: "we do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case." 557 U.S. at 311 n.1, 129 S. Ct. at 2532 n.1. Further, the Court indicated that its holding "does not mean that everyone who laid hands on the evidence must be called."[13] *Id.*

[¶33.] Additionally, Justice Sotomayor's concurrence in *Bullcoming* provides guidance on the issue of whether a testifying analyst's level of involvement in the forensic testing impacts a court's evaluation of a defendant's claim that his or her right to confrontation was violated. In *Bullcoming*, Justice Sotomayor suggested the Court's decision was affected by whether the testifying analyst participated in

---

13. The Court provided this clarification in response to concerns the dissent raised regarding which analyst would be required to testify in situations where multiple individuals participated in the forensic testing process. *Melendez-Diaz*, 557 U.S. 305, 129 S. Ct. 2527.

the forensic testing. ___ U.S. at ___, 131 S. Ct. at 2722 (Sotomayor, J., concurring). Justice Sotomayor recognized that *Bullcoming* "is not a case in which the person testifying is a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue." *Id.* Justice Sotomayor went on to point out that instead, the testifying analyst in *Bullcoming* had no involvement in conducting the forensic testing or producing the report introduced at trial. *Id.*

[¶34.]     With this guidance in mind, we conclude that Medicine Eagle's Confrontation Clause rights were not violated by the State's introduction of testimony from Leal regarding the 2008 and 2011 Y-STR testing. Leal participated in various steps of both the 2008 and 2011 testing and even wrote the original report regarding the results of the 2011 Y-STR testing. Also, Leal independently reviewed, analyzed, and compared the data obtained during the 2008 Y-STR testing. She then came to her own independent conclusions about whether Medicine Eagle could be excluded as a contributor to the samples. In addition, the 2008 and 2011 Y-STR testing reports were not introduced at trial through Leal. Instead, only the chart Leal created, which contained a summary of her conclusions and statistical calculations for each sample, was admitted into evidence. Further, Leal only testified about her own conclusions and statistical calculations. Finally, Medicine Eagle had an adequate opportunity to cross-examine Leal at trial regarding her conclusions and statistical calculations.[14] Therefore, under the

---

14.     Notably, in similar situations, other jurisdictions have concluded that a defendant's Sixth Amendment rights were not violated even though some of the analysts who participated in the forensic testing process did not testify at trial. *See United States v. Boyd*, 686 F. Supp. 2d 382 (S.D.N.Y. 2010), *aff'd*,

(continued . . .)

circumstances of this case, we conclude that Medicine Eagle's Sixth Amendment right to confrontation was not violated by the trial court's admission of Leal's testimony regarding the 2008 and 2011 Y-STR testing, even though analysts who performed some steps of the 2008 and 2011 Y-STR testing did not testify at trial.

[¶35.]    **3.    Whether the trial court erred in denying Medicine Eagle's motion to vacate the part II proceedings.**

[¶36.]    On appeal, Medicine Eagle argues that the State's filing of the Amended Part II Information dismissed the original Part II Information. As a result, Medicine Eagle asserts that when the State dismissed the Amended Part II Information without refiling the original Part II Information or filing a second Amended Part II Information, no part II information even existed upon which the trial court could proceed. Thus, because no part II information existed, Medicine

---

(. . . continued)

> 401 F. App'x 565 (2d Cir. 2010) (holding that defendant's Sixth Amendment right to confrontation was not violated when DNA expert was permitted to testify about the results of preliminary steps of the testing performed by other analysts, which formed part of the basis for the DNA expert's analysis and conclusion); *Disharoon v. State*, 727 S.E.2d 465 (Ga. 2012), *cert. denied*, 133 S. Ct. 767, 184 L. Ed. 2d 507 (2012) (concluding that Confrontation Clause was not violated when expert was allowed to testify about the results of DNA testing, even though expert did not perform every step of the testing); *Pendergrass v. State*, 913 N.E.2d 703 (Ind. 2009) (concluding that defendant's Sixth Amendment rights were not violated when lab supervisor testified to DNA testing results, but analyst who performed the tests did not testify at trial); *State v. Lopez*, 45 A.3d 1 (R.I. 2012) (concluding that defendant's confrontation rights were not violated by lab supervisor's testimony regarding DNA testing results, even though lab supervisor did not perform the preliminary stages of the DNA testing and the analysts that performed those steps were not called to testify at trial); *State v. Manion*, 295 P.3d 270 (Wash. Ct. App. 2013) (holding that testimony of DNA expert regarding results of DNA testing performed by nontestifying analyst did not violate the defendant's Confrontation Clause rights because the DNA expert conducted an independent review of the results and formed her own opinion about the DNA evidence).

Eagle claims the trial court did not have subject-matter jurisdiction over his habitual offender jury trial.

[¶37.] In contrast, the State argues that subject-matter jurisdiction is not an issue because the trial court already obtained personal and subject-matter jurisdiction with regard to the principal offense. Additionally, although the State recognizes that the filing of an amended complaint supersedes an original complaint in civil matters, the State argues that the same rule is not applicable to habitual offender proceedings because a part II information is not the same as a criminal or civil complaint. Further, the State claims that its filing of the dismissal of the Amended Part II Information should actually be treated as an amendment or modification of the Amended Part II Information to revert back to the original Part II Information. Finally, the State argues Medicine Eagle waived his challenge to the part II proceedings because he did not object to the use of the original Part II Information until after the jury found him to be a habitual offender.

[¶38.] We first address the State's argument that Medicine Eagle waived his challenge to the part II proceedings. "Whether this Court has jurisdiction is a legal issue which is reviewed de novo." *State v. Anders*, 2009 S.D. 15, ¶ 5, 763 N.W.2d 547, 549 (citing *State v. Owen*, 2007 S.D. 21, ¶ 10, 729 N.W.2d 356, 362). "Jurisdictional issues can be raised at any time and determination of jurisdiction is appropriate." *Id.* ¶ 5, 763 N.W.2d at 549-50 (citing *Sazama v. State ex rel. Muilenberg*, 2007 S.D. 17, ¶ 9, 729 N.W.2d 335, 340). Further, subject-matter jurisdiction cannot be acquired by agreement, consent, waiver, or estoppel. *Honomichl v. State*, 333 N.W.2d 797, 799 (S.D. 1983).

[¶39.]    Consideration of whether jurisdiction exists generally entails a determination of whether the court possesses personal jurisdiction over the defendant and subject-matter jurisdiction over the subject matter before it. *See Calhoun v. Bryant*, 28 S.D. 266, 133 N.W. 266, 269 (1911). The State is correct that the trial court did have subject-matter jurisdiction over the criminal charges the State brought against the defendant. However, as one court observed, "'[j]urisdiction' is a word of many, too many, meanings." *United States v. Vanness*, 85 F.3d 661, 663 n.2 (D.C. Cir. 1996). In reviewing similar cases involving statutory schemes requiring the filing of an information in order for a defendant to be subject to an enhanced sentence, courts are split over whether the failure to file an information, or defects in its filing, are issues of jurisdiction, or whether instead, such flaws simply prevent, preclude, bar, or deprive the trial court of the authority to impose an enhanced sentence.[15] *See Prou v. United States*, 199 F.3d 37, 44 (1st Cir. 1999).

[¶40.]    In South Dakota, beyond the concepts of personal and subject-matter jurisdiction, we have defined the term "jurisdiction" more broadly to include "the legal power, right, or authority to hear and determine a cause or causes, considered either in general or with reference to the particular matter, . . . [the] power to

---

15.    We note that none of the cases cited by Justice Zinter or Judge Salter involve a situation in which the part II information had been dismissed. We also note that Justice Zinter heavily relies on *State v. Mee (Mee I)*, 67 S.D. 335, 292 N.W. 875 (1940), *rev'd on rehearing*, 67 S.D. 589, 297 N.W. 40 (1941) (*Mee II*) and Justice Wollman's writing in *Honomichl v. State*, 333 N.W.2d 797, 800 (S.D. 1983) (Wollman, J., dissenting). *See infra* Justice Zinter's dissent ¶¶ 71, 75 n.25, 76. We emphasize that neither is controlling, as Justice Wollman did not write for the majority in *Honomichl*, and *Mee I* was reversed by *Mee II*.

inquire into the facts and apply the law, and . . . the right to adjudicate concerning the subject-matter in the given case[.]" *State ex rel. Byrne v. Ewert*, 36 S.D. 622, 156 N.W. 90, 95 (1916) (citation omitted). We have also declared it to mean "whether there was power to enter upon the inquiry and not whether the determination by the court of a question of law or fact involved is correct." *Jannsen v. Tusha*, 68 S.D. 639, 643, 5 N.W.2d 684, 685 (1942). Applying those definitions, we conclude that the question of whether there was statutory authority for the trial court to impose the enhanced sentence (given the disputed legal status of the original/Amended Part II Information) is a jurisdictional question. As a result, this Court can review Medicine Eagle's challenge to the part II proceedings regardless of when he made this challenge.

[¶41.] Next, SDCL 22-7-11 requires that:

> Any allegation that a defendant is an habitual criminal *shall be filed as a separate information* at the time of, or before, arraignment. However, the court may, upon motion, permit the separate information to be filed after the arraignment, but no less than thirty days before the commencement of trial or entry of a plea of guilty or nolo contendre. The information shall state the times, places, and specific crimes alleged to be prior convictions and shall be signed by the prosecutor. An official court record under seal or a criminal history together with fingerprints certified by the public official having custody thereof is sufficient to be admitted in evidence, without further foundation, to prove the allegation that the defendant is an habitual criminal.

(Emphasis added.) This Court has not previously addressed the issue of whether the filing of an Amended Part II Information in a habitual offender proceeding serves to dismiss the original Part II Information. When considering how the filing of an amended information affects the original information, several courts have held

that the filing of an amended information essentially acts as a dismissal of the original information. *See Armstrong v. United States*, 16 F.2d 62, 64 (9th Cir. 1926) (indicating that the amendment of an information causes the original information to be abandoned, and that the filing of a new information "destroyed all functions of the old information as fully as though it had been dismissed by formal motion"); *Wilcox v. State*, 248 So. 2d 692, 694 (Fla. Dist. Ct. App. 1971) (stating that the filing of an amended information "has the effect of vitiating the original information as fully as though it had been formally dismissed by order of court"); *State v. Devine*, 164 P.3d 1009 (N.M. 2007) (reiterating that an amended criminal information has the effect of dismissing a prior criminal information); *State v. Navone*, 39 P.2d 384, 385 (Wash. 1934) (indicating that the original information was superseded by the filing of the amended information).

[¶42.] Additionally, the Supreme Court of New Mexico has applied this same rule in the context of informations filed for purposes of habitual offender proceedings. *See State v. Chacon*, 706 P.2d 152 (N.M. 1985). Specifically, in *State v. Chacon*, the New Mexico Supreme Court recognized that "[a]n 'amended' information vitiates the original information as fully as though it had been formally dismissed by order of the court. It constitutes the filing of a new instrument which supersedes its predecessor." 706 P.2d at 153 (quoting *State v. Benally*, 658 P.2d 1142, 1144 (N.M. Ct. App. 1983)).

[¶43.] For purposes of this case, the State has not offered a valid reason for creating a special rule for a part II information for habitual offender with regard to the effect an amendment has on the original filing. We conclude that when the

State filed the Amended Part II Information, the original Part II Information was effectively dismissed. Thus, following the State's dismissal of the Amended Part II Information, no part II information even existed upon which the trial court could proceed with Medicine's Eagle habitual offender jury trial.[16] The fact that the State included language in its dismissal of the Amended Part II Information indicating that it was not dismissing the original Part II Information and that it intended to proceed upon the original Part II Information makes no difference, because by that point the original Part II Information had already been effectively dismissed. *See Wilcox*, 248 So. 2d at 694 (holding that the State's filing of the amended information dismissed the original information, the State's subsequent withdrawal of the amended information left the State without a charge against the defendant, and the original information could not be "revived"). Furthermore, we reject the State's argument that its filing of the dismissal of the Amended Part II Information should be treated as an amendment to the Amended Part II Information.[17]

[¶44.] SDCL 22-7-11 requires the filing of a part II information. Because the State's filing of the Amended Part II Information and subsequent dismissal of the

---

16. In his discussion of waiver and plain error, Justice Zinter treats the lack of a part II information as a "defective" part II information. We disagree with this treatment. In this case, no part II information even existed at the time of the part II proceedings due to the State's dismissal of the Amended Part II Information. As no part II information existed, it cannot be considered "defective" or otherwise.

17. The filing of the dismissal of the Amended Part II Information served to terminate the part II proceedings under the Amended Part II Information. *See* SDCL 23A-44-2 (providing that "[a] prosecuting attorney may file a dismissal of an indictment, information, or complaint and the prosecution shall thereupon terminate").

Amended Part II Information left the State without a part II information on file, the trial court did not have jurisdiction to continue with the part II proceedings and impose an enhanced sentence.[18] Therefore, the trial court erred in denying Medicine Eagle's motion to vacate the part II proceedings. As a result, on this issue we reverse and remand for resentencing.

**CONCLUSION**

[¶45.] In this case, the trial court did not abuse its discretion in admitting evidence of the incident involving S.M. as other acts evidence pursuant to SDCL 19-12-5 (Rule 404(b)). Subsequent acts are admissible to prove common plan or scheme, and the existence of a common plan or scheme can be proven circumstantially by establishing that the acts are sufficiently similar. Therefore, we affirm on this issue. Next, Medicine Eagle's Sixth Amendment right to confrontation was not violated by the trial court's admission of Leal's testimony regarding the 2008 and 2011 Y-STR testing despite the fact that analysts that performed some steps of the testing did not testify at trial. Leal performed various steps of the 2008 and 2011 testing, independently reviewed, analyzed, and compared the data obtained from the testing, reached her own conclusions regarding the results of the testing, and conducted statistical calculations based on her results. Further, neither the 2008 report nor the 2011 report were introduced

---

18. In *Honomichl v. State*, this Court held that the State's failure to file an information left the court without subject-matter jurisdiction to convict and sentence defendant. 333 N.W.2d at 798-99. Although *Honomichl* was not decided in the context of a part II information for habitual offender, the same principle applies in this case. Further, despite Justice Zinter's analysis, we note that neither party advocated for overruling *Honomichl*.

through Leal at trial, as Leal only testified about her own conclusions. Thus, Medicine Eagle's opportunity to cross-examine Leal was sufficient for purposes of the Sixth Amendment. Consequently, we affirm on this issue. Finally, because the State's filing of the Amended Part II Information effectively dismissed the original Part II Information, no part II information existed upon which the trial court could proceed following the State's dismissal of the Amended Part II Information. As a result, the trial court did not have jurisdiction over the habitual offender proceedings. Therefore, on this issue we reverse and remand for resentencing.

[¶46.] SEVERSON, Justice, concurs.

[¶47.] KONENKAMP, Justice, and SALTER, Circuit Court Judge, concur in part and concur in result in part.

[¶48.] ZINTER, Justice, concurs in part and dissents in part.

[¶49.] SALTER, Circuit Court Judge, sitting for WILBUR, Justice, disqualified.


KONENKAMP, Justice (concurring in part and concurring in result in part).

[¶50.] I concur on Issues 1 and 2. I join Judge Salter's concurrence in result on Issue 3.


SALTER, Circuit Court Judge (concurring in part and concurring in result in part).

[¶51.] I join the Chief Justice's opinion on Issues 1 and 2, and I agree that the error presented in Issue 3 requires this Court to vacate Medicine Eagle's sentences and remand for resentencing. However, I do not agree that the trial court's

imposition of the sentences here implicates its jurisdiction, and I write separately to respectfully add my views.

[¶52.]     Since the indictment in this case alleged offenses cognizable under South Dakota law, the trial court obtained the limit of its subject matter jurisdiction when the case commenced. *See State v. Escalante*, 458 N.W.2d 787, 789 (S.D. 1990) ("A trial court in a criminal case does not acquire subject matter jurisdiction unless state files a formal and sufficient indictment or information.") (citing *In re Brockmueller,* 374 N.W.2d 135 (S.D. 1985); *Honomichl v. State,* 333 N.W.2d 797 (S.D. 1983)). There simply is no additional layer or tier of jurisdiction that exists in a criminal case. I would hold that the trial court exceeded the statutory limits of its sentencing authority but did so without yielding its jurisdiction.

[¶53.]     Nearly all of the federal courts of appeals confronting a similar issue have held that errors in the recidivist enhancement sentencing procedure for federal drug offenders impact only a trial court's sentencing authority—not its jurisdiction. Federal prosecutors may seek enhanced mandatory minimum sentences for violations of the Controlled Substances Act for repeat drug offenders after filing an "information . . . stating in writing the previous convictions to be relied upon." 21 U.S.C. § 851(a)(1); *see also* 21 U.S.C. § 841(b)(viii) (authorizing enhanced sentences). However, in instances where compliance with section 851's information-filing requirements has been suboptimal, the overwhelming majority of federal courts of appeals have refused to treat noncompliance as a jurisdictional infirmity. As the First Circuit Court of Appeals explained:

> Whether or not the prosecution files a timely section 851(a)(1) information, a federal district court plainly possesses subject-

> matter jurisdiction over drug cases. *See* 18 U.S.C. § 3231 (conferring original jurisdiction "of all offenses against the laws of the United States"). This jurisdiction necessarily includes the imposition of criminal penalties. Once subject-matter jurisdiction has properly attached, courts may exceed their authority or otherwise err without loss of jurisdiction. . . . Thus, the only question that legitimately arises from the prosecution's [failure to comply with section 851(a)(1)] concerns the court's authority to impose an enhanced sentence. This is simply not a question of subject-matter jurisdiction. . . .

*Prou v. United States*, 199 F.3d 37, 45 (1st Cir. 1999) (citations omitted); *see also United States v. Pritchett*, 496 F.3d 537, 543-46 (6th Cir. 2007) (reviewing cases and noting only the Eleventh Circuit Court of Appeals has held noncompliance with section 851 implicates a jurisdictional error); *United States v. Mooring*, 287 F.3d 725, 727-28 (8th Cir. 2002) (rejecting claim that irregularity in the section 851 information procedure resulted in a jurisdictional error).

[¶54.] Here, the same analysis applies. The trial court had jurisdiction over this criminal case and, following the guilty verdicts, was obligated to proceed to sentencing. *See* SDCL 23A-27-1 (sentences "shall" be imposed without unreasonable delay). As explained below, the fact it undertook a habitual criminal proceeding without an effective Part II habitual criminal information constituted error which ultimately led to a sentence in excess of its authority. The error did not, however, deprive the trial court of jurisdiction.

[¶55.] The issue—sentencing authority versus jurisdiction—involves more than mere semantics. Jurisdictional errors, as the Chief Justice's opinion states, are not subject to waiver. *United States v. Cotton*, 535 U.S. 625, 122 S. Ct. 1781, 1782, 152 L. Ed. 2d 860 (2002). They are also not subject to appellate review for harmlessness, and they may not be the subject of procedural default in post-

conviction proceedings. *McCoy v. United States*, 266 F.3d 1245, 1248-49 (11th Cir. 2001). Non-jurisdictional errors are treated differently. They can be waived or forfeited, *State v. Ganrude*, 499 N.W.2d 608, 612 (S.D. 1993), and they can be reviewed for harmlessness. *State v. Garritsen*, 421 N.W.2d 499, 501 (S.D. 1988).

[¶56.] Though the question is one of first impression in South Dakota, this Court's previous decisions point decidedly, if implicitly, toward treating irregularities in the habitual offender procedures as non-jurisdictional errors. For instance, in *State v. Pasek*, this Court held that despite the trial court's erroneous determination of the number of previous convictions, the defendant was not prejudiced because there was, in any event, a sufficient number of prior convictions to support his enhanced sentence. 2004 S.D. 132, ¶ 31, 691 N.W.2d 301, 310-11 n.12. Further, in *State v. Anderson*, this Court rejected a prisoner's repeated post-conviction efforts to challenge his enhanced sentence, noting his "failure to raise the issue on [direct] appeal barred any further appeal on the issue, and left only habeas corpus" and other post-conviction remedies as "possible avenues for . . . relief." 2005 S.D. 22, ¶ 24, 693 N.W.2d 675, 682. This Court has also affirmed a trial court's decision to sentence a defendant as a habitual criminal despite the State's failure to refile a "new" Part II habitual criminal information when the defendant was arraigned on an additional principal felony charge. *State v. Graycek*, 368 N.W.2d 815, 818 (S.D. 1985). In *Graycek*, the defendant pleaded guilty to the additional felony charge as well as reduced misdemeanor drug charges pursuant to a plea agreement. The defendant objected to the state's failure to file another habitual criminal information before sentencing, but declined the trial court's offer to allow

him to withdraw his guilty pleas and "be reinstated to the position he was in prior to entering his pleas. . . ." *Id.* at 817-18. These cases strongly suggest that failure to comply with the habitual criminal statutes may be reviewed for harmlessness and also that it may be waived[19] or the subject of procedural default—none of which is consistent with a jurisdictional error.[20] *See State v. Knoche*, 515 N.W.2d 834, 840 (S.D. 1994); *State v. Moves Camp*, 376 N.W.2d 567, 569 (S.D. 1985).

[¶57.]     The divergent views on this subject may well be attributable to the imprecision with which the term "jurisdiction" has historically been used. However, in its contemporary concept of subject matter jurisdiction, the Supreme Court has held that jurisdiction means simply "'the courts' statutory or constitutional *power* to adjudicate the case.'" *Cotton*, 535 U.S. at 630, 122 S. Ct. at 1784, (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 89, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998)). The facts in *Cotton* quickly illustrate the distinction between sentencing authority and the power to sentence.

[¶58.]     In *Cotton*, a federal indictment alleging drug conspiracy offenses did not include threshold quantities necessary to trigger enhanced sentences. The trial court's decision to impose an enhanced sentence was, therefore, erroneous, but it did

---

19.     For example, in *Graycek*, this Court noted the defendant "in effect acquiesced" to the additional principal felony charge. 368 N.W.2d at 818.

20.     Though this Court has from time to time made reference to "jurisdiction" in the context of a habitual offender enhancement, it is clear the question has not been squarely presented and addressed on the merits. *See, e.g., Graycek*, 368 N.W.2d at 818; *In re Abelt*, 82 S.D. 308, 145 N.W.2d 435 (1966). Nor does the Chief Justice's opinion rely upon these cases as controlling authority for its conclusion that the error here is jurisdictional.

not implicate subject matter jurisdiction and could be reviewed for harmlessness under the plain error doctrine. *Id.* at 631, 122 S. Ct. at 1785.

[¶59.] Applying these principles, the trial court's procedural error here should also be reviewed for harmlessness. In my view, Medicine Eagle has preserved his objection to his sentence by objecting to it before it was imposed, and I would review the error for harmless error, rather than the more demanding strictures of the plain error doctrine. *See United States v. Smith*, 573 F.3d 639, 659 (8th Cir. 2009) (errors which are preserved are reviewed for harmless error); *State v. Gard*, 2007 S.D. 117, ¶ 15, 742 N.W.2d 257, 261 (in order to preserve an issue for appellate review, "[t]he trial court must be given an opportunity to correct any claimed error before we will review it on appeal") (citation omitted); *see also State v. Holter*, 340 N.W.2d 691, 692 (S.D. 1983) (holding defendant's sentencing argument was not properly before the Court because he "did not at any time prior to this appeal raise a claim that his sentence was improper or illegal").[21]

[¶60.] Under harmless error review, error is harmless and may be disregarded where it does not affect a defendant's substantial rights. SDCL 23A-44-14. The State must prove the error was not prejudicial. *State v. Nelson*, 1998 S.D. 124, ¶ 8, 587 N.W.2d 439, 443. Here, the State cannot sustain this burden.

---

21. Here, the record establishes the trial court had the opportunity to address Medicine Eagle's objection to the habitual offender sentencing enhancement. After Medicine Eagle filed an objection in advance of his sentencing hearing, the trial court considered the argument and rejected it, ultimately entering written findings of fact and conclusions of law. Under the circumstances, the trial record is sufficiently developed to enable appellate review.

[¶61.] The inquiry in this regard begins not with a judicial assessment of the purpose behind the habitual offender statutes or whether Medicine Eagle had notice that the State was seeking an enhanced sentence based upon the original Part II information. Rather, the analysis begins with the text of the principal statute at issue here which allows for an enhanced sentence only after a separate information has been filed. *See* SDCL 22-7-11. In addition, faithful application of this Court's decisions requires that the habitual offender statutes be strictly construed because of their "highly penal nature." *See State v. Loop*, 422 N.W.2d 420 (S.D. 1988) (habitual offender statutes should be strictly construed given their "highly penal nature"); *Graycek*, 368 N.W.2d at 818; *State v. Grooms*, 339 N.W.2d 318 (S.D. 1983); *State v. Layton*, 337 N.W.2d 809 (S.D. 1983).

[¶62.] The text of SDCL 22-7-11 provides in relevant part:

> Any allegation that a defendant is an habitual criminal shall be filed as a separate information at the time of, or before, arraignment. However, the court may, upon motion, permit the separate information to be filed after the arraignment, but no less than thirty days before the commencement of trial or entry of a plea of guilty or nolo contendre. The information shall state the times, places, and specific crimes alleged to be prior convictions and shall be signed by the prosecutor.

[¶63.] The statute includes four principal requirements: (1) the filing of an information (2) signed by the prosecutor (3) at least thirty days before the trial or change of plea and (4) stating the times, places and specific crimes alleged. These requirements must be satisfied as a predicate to a sentencing judge's authority to

impose an enhanced sentence.[22] If these requirements are not satisfied, the imposition of an enhanced sentence could well lead to sentencing error which is not harmless.

[¶64.]     That aptly describes what happened in this case. The original Part II Information was replaced by a superseding, amended Part II Information which was then, itself, dismissed, leaving no effective habitual offender information. Under these circumstances, the imposition of an enhanced mandatory life sentence presents a clear case of prejudice. Though a sentence of up to life was authorized at the time Medicine Eagle committed the offense of kidnapping, the habitual offender enhancement required a mandatory life sentence by elevating the authorized punishment from that of a Class 1 felony to a Class B felony.[23] Indeed, the trial court stated during the sentencing hearing that "[t]his is a mandatory life sentence"

---

22. Though these requirements are necessary to a trial court's authority to impose an enhanced sentence, they should not be regarded as *de facto* "jurisdictional" requirements. Unlike true components of subject matter jurisdiction, the statutory requirements of SDCL 22-7-11 could be waived or reviewed for harmlessness. Indeed, this distinction appears to figure prominently in the Eighth Circuit Court of Appeals' holding in *Mooring*, that the defendant had waived 21 U.S.C. § 851's information requirement at the time of his change of plea hearing by stipulating that he had received sufficient notice under section 851. 287 F.3d at 727-728. In this case, by contrast, there is no indication Medicine Eagle actually undertook a knowing, voluntary and intelligent waiver of his rights under SDCL 22-7-11.

23. In 2005, the Legislature amended the statute prescribing felony classes and penalties by adding a category of Class C felony, punishable by up to life in prison. SDCL 22-6-1(3). The maximum prison sentence for a Class 1 felony was reduced to fifty years. SDCL 22-6-1(4). The kidnapping statute, SDCL 22-19-1, was also amended in 2005, but at the time of Medicine Eagle's offense, kidnapping was a Class 1 felony in the absence of the victim's "permanent physical injury[.]" *State v. Frazier*, 2002 S.D. 66, ¶ 12, 646 N.W.2d 744, 749.

and that it "was not exercising any discretion in terms of that sentence." Sentencing Hearing Transcript at 31. Therefore, the trial court's error was not harmless, and the case must be remanded for resentencing on the kidnapping charge.

[¶65.]    The question of whether resentencing is required for the sexual contact and rape convictions presents a closer question, in my view. Both sentences were within the unenhanced sentencing ranges, and a credible argument could be made that the sentences were unaffected by the missing Part II Information. *See* Sentencing Hearing Transcript at 29 (trial court stating "those are the maximum penalties under the unenhanced charges pursuant to the Part II Information."). However, the trial court also ordered that the sentences be served concurrent to the life sentence after observing, "I don't see any purpose being served by consecutive sentences in that regard." *Id.* Given the fact that the trial court will resentence on the kidnapping charge and the fact the individual sentences could be potentially interrelated, the trial court may well feel differently on remand and should have the ability to undertake sentencing on all the counts of conviction.

ZINTER, Justice (concurring in part and dissenting in part).

[¶66.]    I join the Court's opinion on Issues 1 and 2, but I dissent on Issue 3 (vacating Medicine Eagle's sentences). On Issue 3, I agree with Judge Salter and Justice Konenkamp that the error alleged in the part II information proceedings involved the question of statutory authority rather than the circuit court's subject matter jurisdiction. Judge Salter's federal authorities highlight that distinction. I

write to explain why South Dakota's constitution, statutes, and precedent also require recognition of the distinction. My only disagreement with Judge Salter's analysis is his additional conclusion that Medicine Eagle made the objection necessary to preserve this issue for harmless error review. Medicine Eagle is limited to plain error review because he did not raise his current part II information objection before the part II information trial. And under plain error review, his sentences must be affirmed under Supreme Court precedent.

[¶67.] There is no dispute that the circuit court had *jurisdiction* over this *subject matter*. This Court has long-defined "jurisdiction" as: "the power to hear and determine the subject-matter in controversy between parties to a suit, [and] to adjudicate or exercise any judicial power over them[.]" *Calhoun v. Bryant*, 28 S.D. 266, 271, 133 N.W. 266, 269 (1911) (quoting Herman on Estoppel & Res Judicata, vol. 1, par. 66). We have adhered to similar definitions to this day. *See, e.g.*, *supra* Chief Justice's opinion ¶ 40; *Wipf v. Hutterville Hutterian Brethren, Inc.*, 2013 S.D. 49, ¶ 21, ___ N.W.2d ___, ___ (alteration in original) (quoting Restatement (Second) of Judgments § 11 (1982)) (defining "[s]ubject matter jurisdiction" as "the 'authority [of courts] to adjudicate the type of controversy involved in the action'").

[¶68.] The circuit court's power to hear and determine all aspects of criminal cases is derived from the South Dakota Constitution and Legislature. Article V, § 5 of the South Dakota Constitution provides in pertinent part: "The circuit courts have original jurisdiction in all cases except as to any limited original jurisdiction granted to other courts by the Legislature." And the Legislature has not limited any aspect of the circuit court's criminal jurisdiction. SDCL 16-6-12 provides:

> The circuit court has exclusive original jurisdiction to try and determine all cases of felony, and original jurisdiction concurrent with courts of limited jurisdiction as provided by law to try and determine all cases of misdemeanor and actions or proceedings for violation of any ordinance, bylaw, or other police regulation of political subdivisions.

Based upon these provisions, the circuit court had "the power to hear and determine" all aspects of Medicine Eagle's criminal case and to "exercise any judicial power" over the parties. *See Calhoun,* 28 S.D. at 271, 133 N.W. at 269. Its jurisdiction over the subject matter is clear.

[¶69.]	The disagreement on appeal arises from the reliance the Chief Justice's opinion places on *Honomichl v. State*, 333 N.W.2d 797 (S.D. 1983). In *Honomichl*, no part II informations had been filed with respect to the convictions at issue. Three members of this Court did state that "[w]ithout a formal and sufficient indictment or information, a court does not acquire subject matter jurisdiction and thus an accused may not be punished for a crime." *Id.* at 798. But under the modern understanding of subject matter jurisdiction, this view is no longer followed.[24]

[¶70.]	*Honomichl* was decided by a divided Court. Two justices would have held that a defendant can waive the failure to file an information by pleading guilty because the failure to file an information is not jurisdictional. Three justices held that the lack of an information was a jurisdictional defect, which was not subject to

---

24.	The Chief Justice's opinion agrees with the definition of subject matter jurisdiction. *See supra* Chief Justice's opinion ¶ 40. The flaw in the opinion's reasoning is that it equates "statutory authority" with "subject matter jurisdiction." *See id.* If this reasoning were correct (it is not), all trial errors involving statutory authorization would constitute jurisdictional errors not subject to waiver.

waiver. The majority relied on two authorities. It first relied on *State v. Mee* (*Mee I*), 67 S.D. 335, 292 N.W. 875 (1940), *rev'd on rehearing*, 67 S.D. 589, 297 N.W. 40 (1941). The *Mee* cases, however, were unusual because this Court initially held that entry of a plea without the filing of an information waived the information. *Mee I*, 67 S.D. at 340-41, 292 N.W. at 877. Only on reconsideration did the Court rule that the result of not filing an information was that "from [that] point on the county court was without jurisdiction to proceed further in the case until the state's attorney had filed an information." *State v. Mee* (*Mee II*), 67 S.D 589, 591, 297 N.W. 40, 41 (1941). But the *Mee II* Court failed to cite any authority or even one sentence of reasoning for its change in position. As then Justice Wollman later observed, had the *Mee II* Court recognized the distinction between subject matter jurisdiction in terms of a court's ability to adjudicate certain classes of cases and a court's jurisdiction over a particular offense and the particular defendant, "it may well have adhered to its original opinion, which held that defendant had waived the filing of an information by his plea of guilty." *Honomichl*, 333 N.W.2d at 800 (Wollman, J., dissenting).

[¶71.] The *Honomichl* majority's only other authority was *Albrecht v. United States*, 273 U.S. 1, 47 S. Ct. 250, 71 L. Ed. 505 (1927). 333 N.W.2d at 798. *Albrecht*, in turn, relied upon *Ex parte Bain*, 121 U.S. 1, 7 S. Ct. 781, 30 L. Ed. 849 (1887). In *Bain*, the Supreme Court utilized language analytically identical to that in *Mee II*. The Supreme Court held that after an insufficient superseding indictment—which is the same as an information for purposes of today's discussion—"the jurisdiction of the offense [was] gone, and the court [had] no right to proceed any further in the

progress of the case for want of an indictment." *Bain*, 121 U.S. at 13, 7 S. Ct. at 788. After *Honomichl*, however, *Bain* was overruled by a unanimous Supreme Court in *United States v. Cotton*, 535 U.S. 625, 122 S. Ct. 1781, 152 L. Ed. 2d 860 (2002).

[¶72.]     *Cotton* rejected the 1887 *Bain-Mee II* concept of jurisdiction as outdated. *Id*. at 629-30, 122 S. Ct. at 1784-85. The Court observed that it was a "somewhat expansive notion of jurisdiction, which was more a fiction than anything else[.]" *Id*. at 630, 122 S. Ct. at 1784-85 (internal citations and quotation marks omitted). The Court ruled that the *Bain-Mee II* concept of jurisdiction was not in keeping with its modern meaning: "*i.e.*, 'the courts' statutory or constitutional *power* to adjudicate the case.'" *Id*. (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 89, 118 S. Ct. 1003, 1010, 140 L. Ed. 2d 210 (1998)).

[¶73.]     The Supreme Court went on to rule that, even though jurisdiction can never be forfeited or waived, the right to indictment can be waived. *Id*. at 630, 122 S. Ct. at 1785. Waiver can occur because, as the Court had noted in a number of its post-*Bain* cases, "defects in an indictment do not deprive a court of its power to adjudicate a case." *Id*. at 630-31, 122 S. Ct. at 1785 (discussing *Lamar v. United States*, 240 U.S. 60, 36 S. Ct. 255, 60 L. Ed. 526 (1916) and *United States v. Williams*, 341 U.S. 58, 66, 71 S. Ct. 595, 95 L. Ed. 747 (1951)). Ultimately, the Court expressly overruled *Bain,* holding that "indictment defects" and "indictment omissions" do not deprive a trial court of jurisdiction. *See id*. at 631, 122 S. Ct. at 1785 (stating that "*Bain* is overruled").

[¶74.]    This Court issued similar post-*Honomichl* decisions in the habitual offender context indicating that the failure to properly file a part II information does not compromise a circuit court's jurisdiction. In *State v. Grooms*, 339 N.W.2d 318, 320-21 (S.D. 1983), this Court held that failure to re-serve a copy of the part II information on the defendant before his retrial did not alone justify reversal of his habitual offender conviction. In *State v. Graycek*, 368 N.W.2d 815, 818 (S.D. 1985), this Court held that the failure to refile a part II information after the original charges against the defendant were dismissed and new charges were filed did not deprive the trial court of jurisdiction to sentence the defendant as a habitual offender. And in *State v. Alexander*, 313 N.W.2d 33 (S.D. 1981), following a mistrial, the defendant was charged under a new amended indictment with different language. Notwithstanding this new proceeding and the State's failure to "file a new supplemental information for habitual offender," this Court found no error. *Id.* at 34. We did so because—somewhat like our case today—an habitual criminal information had been filed in the original (but dismissed) proceeding and the State had advised that it intended to proceed on the allegations that were contained in the information from that dismissed proceeding.[25]

---

25.    The Chief Justice's opinion overlooks these cases when it states that none of the cases in this writing deal with "a situation in which the part II information had been dismissed." *See supra* Chief Justice's opinion ¶ 39 n.15. In each of the foregoing cases there was *no* part II information that had been filed or served in the criminal proceeding in which the defendant was being prosecuted. And there is no distinction between proceeding in a criminal action in which there is no information and proceeding in a criminal action in which the information is dismissed. For this reason, the Chief Justice's opinion also overlooks several additional cases. For example, former Justice Wollman's writing came in a case in which this Court was reviewing

(continued . . .)

[¶75.] These decisions and the *Cotton* ruling support Justice Wollman's opinion in *Honomichl,* concluding that the *failure to file* an information is not a subject matter jurisdiction defect and the lack of an information may be waived. *See Honomichl*, 333 N.W.2d at 800 (Wollman, J., dissenting). As Justice Wollman stated rhetorically, "If the Fifth Amendment's guarantee of the right to a grand jury presentment or indictment . . . in the federal courts is a personal privilege that may be waived . . . , why may it not be held that the alternative charging document [*i.e.*, an information] provided by Art. VI, § 10 of the South Dakota Constitution is a personal privilege that may also be waived?" *Id.* (citing *Barkman v. Sanford*, 162 F.2d 592 (5th Cir. 1947)). Justice Wollman was joined in his dissent by then Justice Dunn. Because their view of subject matter jurisdiction was adopted by the Supreme Court in *Cotton*, as well as the numerous courts cited in Judge Salter's writing, we should not cling to an 1887 view of jurisdiction that is no longer followed. The Chief Justice's opinion does not cite one post-*Cotton* case supporting

_____

(. . . continued)

jurisdiction following guilty pleas where "informations were not filed by the State on either offense." *Honomichl*, 333 N.W.2d at 798. In *Mee I*, "no information had been filed . . . , but this [Court concluded that it] did not affect the jurisdiction of the court over the act charged in [that] case." 67 S.D. at 339, 292 N.W. at 877. And like the case we consider today, the opinion reversed in *Bain* came in a case where amendments to an indictment were determined to render the indictment "no indictment of a grand jury" at all. *Bain*, 121 U.S. at 13, 7 S. Ct. at 787, *overruled by Cotton*, 535 U.S. 625, 122 S. Ct. 1781, 152 L. Ed. 2d 860. Ultimately, the United States Supreme Court has concluded that a defendant may waive the right to *any* indictment, not just "dismissed" indictments. *Cotton*, 535 U.S. at 630, 122 S. Ct. at 1785. As an aside, it should finally be noted that the original part II information in today's case was never dismissed by the circuit court or the State. As is more fully explained hereafter, *infra* ¶¶ 77 and 82, both the circuit court and the State acceded to Medicine Eagle's request to dismiss the amended part II information and proceed on the original part II information.

its subject matter jurisdiction theory. We should overrule *Honomichl* and now hold that the lack of a part II information is waivable because it does not divest circuit courts of their subject matter jurisdiction over criminal cases. Under article V, § 5 of the South Dakota Constitution and SDCL 16-6-12, the circuit court's subject matter jurisdiction—its power to adjudicate such proceedings—cannot be called into question.[26]

[¶76.] We should also not lose track of what occurred in this case. In the course of a single criminal proceeding, the State timely filed a part II information, and it timely filed an amended part II information that added to but did not eliminate the originally alleged prior conviction. The State subsequently dismissed the amended part II information, expressly stating in the dismissal that it was proceeding on the originally filed part II information. Even if the Chief Justice's opinion were correct that no part II information remained following this procedural course of events, the issue on appeal concerns the habitual criminal penalty, not the State's power to initiate the case in a circuit court. Therefore, these procedural

---

26.     Moreover, even if we were to continue to follow the now discredited view of subject matter jurisdiction as expressed in *Honomichl* and *Mee II,* jurisdiction over the habitual criminal proceedings clearly attached in this case because the State filed the original part II habitual criminal information and gave notice of its intent to proceed on the allegations in that information. As this Court ruled in *Alexander,* even though the original case has been dismissed, the State may properly proceed with habitual criminal proceedings in a second case without filing a new habitual criminal information as long as the State gives notice that it intends to proceed on the allegations contained in the part II information from the dismissed case. *Alexander*, 313 N.W.2d at 34, 37. Analytically, this is no different than what occurred in the case we consider today.

events did not divest the circuit court of its subject matter jurisdiction under the constitution and SDCL 16-6-12.

[¶77.]       Although the purported absence of a part II information was not a jurisdictional defect, it was a defect in the institution of the part II prosecution or a defect in the part II information itself. Such defects must be raised by motion prior to trial or are deemed waived. SDCL 23A-8-3 (Rule 12(b)); SDCL 23A-8-9 (Rule 12(f)).

[¶78.]       Required motions under Rule 12(b) range from "[d]efenses and objections based on defects in the institution of the prosecution;" SDCL 23A-8-3(1), to "[d]efenses and objections based on defects in the indictment or information[;]" SDCL 23A-8-3(3). Within that range lies a defense or objection based upon the dismissal of an amended part II information and the continuation of the habitual offender proceedings under a previously filed part II information. Concluding otherwise controverts the intent of Rule 12(b) to restrict "the defense tactic of 'sandbagging'" where defense counsel, recognizing a defense "would forego raising the defect before trial, when a successful objection would merely result in an amendment of the pleading (or a new pleading)." 5 Wayne R. LaFave et al., *Criminal Procedure* § 19.1(d) (3d ed. 2007).[27] Here, the dismissal of the amended

---

27.      Judge Salter's concurrence in result correctly notes that defenses and objections *may* be preserved for appellate review if the trial court has been given an opportunity to correct claimed errors. *See supra* Judge Salter's opinion ¶ 60. Although Medicine Eagle raised an objection before sentencing, SDCL 23A-8-3 (Rule 12(b)) *further required* that the objection be raised before trial to provide the opportunity for corrective measures such as the "amendment of a pleading (or a new pleading)." *See* 5 Wayne R. LaFave et al., *Criminal Procedure* § 19.1(d) (3d. ed. 2007). Medicine Eagle's
(continued . . .)

part II information and continuation of proceedings under the original part II was not only clear to Medicine Eagle, he requested proceeding on the original part II information in his motion to dismiss the amended part II. Yet the majority today would reward Medicine Eagle for his sandbagging in the assertion of this claimed defense or objection. This should not occur under rules specifically designed to prevent such practices.

[¶79.] Medicine Eagle did not make the required motion before trial. Because the claimed error was not raised before trial as required by SDCL 23A-8-3(1) (Rule 12(b)), the objection was waived under SDCL 23A-8-9 (Rule 12(f)). Therefore, at best, the claimed defect in the habitual criminal proceedings is subject to review for plain error. "Where an issue has not been preserved by objection at trial, our review is limited to whether the trial court committed plain error." *State v. Bowker*, 2008 S.D. 61, ¶ 45, 754 N.W.2d 56, 69. *See also United States v. Washington*, 653 F.3d 1251, 1258 (10th Cir. 2011) (stating that a "late-blooming claim [challenging] an indictment for failure to charge an offense" is reviewable for plain error); *United States v. Blade*, 336 F.3d 754, 756-57 (8th Cir. 2003) (citing *Cotton*, 535 U.S. at 627, 122 S. Ct. at 1783; *United States v. McBride*, 862 F.2d 1316, 1319 (8th Cir. 1988)) (applying plain error review to the denial of a motion for new trial based upon a defect in an indictment).

---

(. . . continued)
    sandbagging here deprived the State of that opportunity to file a new or amended pleading. Therefore, under the rules, the objection was waived, relegating the objection to plain error review.

[¶80.]      To demonstrate plain error, a defendant must establish that there was:

> (1) error, (2) that is plain, (3) affecting substantial rights; and
> only then may we exercise our discretion to notice the error if (4)
> it seriously affects the fairness, integrity, or public reputation of
> the judicial proceedings.

*State v. Olvera*, 2012 S.D. 84, ¶ 9, 824 N.W.2d 112, 115 (quoting *State v. Jones*, 2012 S.D. 7, ¶ 14, 810 N.W.2d 202, 206). This is the same plain error standard utilized by the Supreme Court. *See Cotton*, 535 U.S. at 631-32, 122 S. Ct. at 1785. In analyzing an analogous defective indictment proceeding, the *Cotton* Court skipped immediately to the last element of the test. The Supreme Court concluded that the indictment error in that case did not "seriously affect the fairness, integrity, or public reputation of judicial proceedings[,]" because the evidence was "'overwhelming'" and "'essentially uncontroverted.'" *Id*. at 632-33, 122 S. Ct. at 1786) (quoting *Johnson v. United States*, 520 U.S. 461, 470, 117 S. Ct. 1544, 1550, 137 L. Ed. 2d 718 (1997)).

[¶81.]      Like the case in *Cotton*, Medicine Eagle can claim no lack of fairness, integrity, or public reputation in the part II habitual criminal proceedings because his criminal history is not disputed on appeal. Additionally, the original part II information was timely filed and he was duly arraigned on it before trial on the principal and habitual criminal charges. Thus, he had notice of the specific habitual offender allegation that was ultimately tried. Further, the amended part II information was dismissed on Medicine Eagle's motion before trial, and Medicine Eagle specifically requested as part of his motion that "the case proceed on the original [p]art II information that was filed at the initiation of [the] case." The State and the circuit court proceeded exactly as Medicine Eagle requested. The

State dismissed the amended part II information and explicitly stated in its written dismissal that "[t]he State does not dismiss the original part II and intends to proceed with that original part II at the trial on such matter." The State then proceeded to trial on the original part II information with no objection whatsoever from Medicine Eagle.

[¶82.]     "'A criminal trial is not a game where defendant's counsel may lie in the weeds and hold back motions or objections that go to the very heart of the prosecution. There exist ample means of attacking the sufficiency of the charge prior to trial. SDCL 23A-8-2.'" *State v. Lachowitzer*, 314 N.W.2d 307, 309 (S.D. 1982) (quoting *State v. Williams*, 297 N.W.2d 491, 493 (S.D. 1980)). Even on appeal, Medicine Eagle does not challenge the existence or validity of the prior conviction he was found guilty of. Thus, to paraphrase *Cotton*, "[t]he real threat . . . to the 'fairness integrity, and public reputation of judicial proceedings' would be if [Medicine Eagle], despite the overwhelming and uncontroverted evidence . . . [of his prior conviction was] to receive a sentence prescribed for those committing less substantial . . . offenses because of an error that was never objected to at trial." *See* 535 U.S. at 634, 122 S. Ct. at 1787.

[¶83.]     For these reasons, I respectfully dissent as to Issue 3. I would affirm Medicine Eagle's convictions and sentences as a habitual offender.